Thomas STOKES, Plaintiff-Appellee,

v.

Euda DELCAMBRE, as Sheriff of Vermillion Parish, et al., Defendants-Appellants.

No. 82–4343.

United States Court of Appeals, Fifth Circuit.

Aug. 1, 1983.

Domengeaux & Wright, Robert K. Tracy, Lafayette, La., for defendants-appellants.

Morrow & Morrow, Patrick C. Morrow, Jeffrey M. Bassett, Opelousas, La., for plaintiff-appellee.

Before INGRAHAM, WILLIAMS and HIGGINBOTHAM, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

This is an appeal from a jury verdict awarding substantial compensatory and punitive damages to a Mississippi college student against a Louisiana sheriff and his deputy for injuries suffered while jailed on a misdemeanor charge. Finding that the trial court applied the proper legal standards and finding sufficient evidence to support the jury's verdict, we affirm.

On Monday, August 13, 1979, Thomas Stokes, a twenty-one year old white male, was driving after work at his summer job with three co-workers in a pickup truck. A beer bottle was allegedly thrown from the window of the pickup and broke at the feet of two men walking along the side of the highway.[1]

---

1. Our description of the facts takes the view favorable to the jury verdict. Much of the evidence was contested; we do not attempt to catalogue all such disputes.

The "pedestrians" enlisted the aid of Deputy Demarcay of the Vermillion Parish Police. Unable to identify who in the truck threw the bottle, Demarcay arrested all four occupants and booked them into the Vermillion Parish Jail. Stokes had never been arrested before.

On their arrival at the jail, one of the four called their supervisor and left a message with an answering service describing their situation. At about 6:00 p.m. the book-in procedure was completed. The four were taken to the bull pen in the north cell block. The cell block had four cells although each was locked when the four arrived. The bull pen served as a common area or dayroom for the cells and had a shower, commode and sink with two picnic tables but no bunks. Each of the arrestees received a bare mattress on which to sleep.

Around 7:00 a.m. the next morning, trusties brought a breakfast of bread and chocolate milk. The cells were then unlocked, releasing a dozen other prisoners into the bull pen area. All of them were black and virtually all faced felony charges. Shortly thereafter, Stokes and Wayne Shows, another of the four, entered one of the cells where a television was playing. At approximately 10:30 a.m., Otis Howard, a black male charged with burglary and armed robbery, entered the cell. As Stokes started to stand, Otis without warning struck him in the face with his fist. As Otis pummeled Stokes, "Boo Boo" Dixon, a two hundred forty-five pound male who was jailed on charges that included aggravated rape, began to slug Shows. He also shoved Stokes, causing Stokes to strike his head and cut his scalp. Stokes was by this time bleeding profusely from the head wound and a broken nose. Despite much screaming and yelling, no jailer came. Stokes made his way back to the bull pen leaving a trail of blood which the prisoners attempted to wipe up with a sheet. Stokes made his way to one of the cells. Lunch was served by the trusties but no jailer came in.

Stokes explained that throughout this time he asked the other prisoners for help which was refused. He explained that he was fearful of going to the front of the cell block: Boo Boo had told him if he complained he would be sent out on a stretcher and had suggested that it would be difficult for him to talk with his throat cut. At Boo Boo's direction, Stokes washed his clothes in the urinal in an effort to remove the fresh blood. Romero, on the other hand, testified that he saw Stokes after the "fight," but that Stokes refused assistance saying it was just a little "scrimmage."

At approximately 6:00 p.m., a jailer entered the bull pen area and, at the direction of Boo Boo, Stokes requested a carton of cigarettes. This was the first time according to Stokes that he had seen a jailer since breakfast. The cigarettes were delivered and were taken by Boo Boo. Boo Boo then sexually assaulted Stokes, compelling him to engage in anal and oral sex. Wayne Shows suffered a similar fate.

The next morning, weak from loss of blood and feigning illness, Stokes attempted to attract attention when breakfast was served. When Romero, the deputy on duty, was shown his cut, Boo Boo, who was standing immediately beside Stokes, asserted that Stokes had fallen from his bunk. Romero asked if that was what happened and Stokes, fearful of saying otherwise, agreed. Romero then said, "I can't let you go to the hospital. I sent a boy to the hospital yesterday and they couldn't find anything wrong with him. Go back to your cell." It turned out that no person had been sent to the hospital the previous day. Later, two trusties carried Stokes from the cell block where he was handcuffed and taken to the hospital. Late that afternoon, Stokes' parents arrived from Mississippi and obtained his release.

Stokes and Shows filed a suit in federal court supported by both diversity and Civil Rights Act jurisdiction. They asserted constitutional claims under 42 U.S.C. § 1983 and negligence under Louisiana law against the parish, North River Insurance Company, Sheriff Euda L. Delcambre and Deputy Alton Romero. Shows decided not to pursue his case and dismissed his claim before trial. The claims against the police jury, as well as additional claims relating to the

legality of Stokes' arrest, were dismissed at the close of plaintiff's case.

The trial court instructed the jury as to the law of negligence and explained with regard to the constitutional claims that:

A prisoner in a jail has a constitutional right to be reasonably protected from the constant threat of violence and physical assault from his fellow inmates. To obtain relief, he must show a pervasive risk of harm to inmates from other prisoners, and he must show that the prison officials have failed to exercise reasonable care to prevent prisoners from intentionally inflicting harm or creating unreasonable risk of harm to other prisoners.

He further explained to the jury that if they found Sheriff Delcambre or Deputy Romero

knew or should have known that the failure to fulfill this obligation of creating reasonable safety in the jail posed a danger to the Plaintiff, and knowing of the danger, ... failed to take reasonable steps to protect the Plaintiff ...

they should hold them responsible. So instructed the jury found in answer to special interrogatories that both Delcambre and Romero violated Stokes' constitutional rights and that Sheriff Delcambre was guilty of negligence as well, all of which were proximate causes of injury. Finally, the jury found that Stokes was not contributorily negligent. The jury then awarded $70,000 in compensatory damages against Sheriff Delcambre and Alton Romero and $205,000 in punitive damages against the sheriff and $105,000 in punitive damages against his deputy. On this verdict, the trial court entered judgment against the sheriff, the deputy and North River Insurance Company for all damages and denied defendants' motion for new trial and alternatively for judgment n.o.v.

Defendants urge: (1) there was insufficient evidence that they violated the plaintiff's constitutional rights; (2) they were protected by the doctrine of qualified immunity and this protection warranted a directed verdict; (3) the trial court's standard for punitive damages was incorrect; (4) plaintiff's counsel improperly made a Gold-

en Rule final argument; (5) the award of punitive damages was excessive; (6) the award of punitive damages reflected a quotient verdict; (7) there were errors in the voir dire examination; (8) character evidence was erroneously excluded; and (9) the trial court abused its discretion in refusing to allow the jury to view the jail.

*Sufficiency of Evidence on Liability*

■ Defendants attack the district court's denial of a directed verdict and j.n. o.v. The standard of review is "whether reasonable men could, under any theory submitted to the jury, have resolved the dispute as the jury did." *Thompson v. Bass,* 616 F.2d 1259, 1267 (5th Cir.1980), *cert. denied,* 449 U.S. 983, 101 S.Ct. 399, 66 L.Ed.2d 245 (1980). *See also Boeing Co. v. Shipman,* 411 F.2d 365 (5th Cir.1969) (en banc). Defendants urge that the evidence was insufficient to support the jury's finding that Delcambre and Romero violated Stokes' constitutional rights.

■ In *Jones v. Diamond,* 636 F.2d 1364 (5th Cir.1981), we found confinement in a prison "where terror reigns" to be cruel and unusual punishment. Specifically, we found that failure to control or separate prisoners who endanger the physical safety of other prisoners can constitute cruel and unusual punishment. *Id.* 1374. But we here need not dwell on the difference in rights enjoyed by pre-trial detainees and convicted persons or the maturation of prisoners' rights in general. Suffice it to say that it is as clear now as it was in June 1979 that all jailers owe a constitutionally rooted duty to their prisoners to provide them reasonable protection from injury at the hands of their fellow prisoners.

■ There was ample evidence from which the jury could have concluded that the jail was administered in a manner virtually indifferent to the safety of prisoners and that this was a direct cause of Stokes' injuries. The jail in times past had a glass viewing panel through which the jailers could observe the prisoners. The panel had been broken several times and at all pertinent times here was shut with a metal

panel. The jury could have concluded that this made effective passive viewing of the cell block impossible and supported what became essentially a "reign of terror."

The evidence also showed that no effort had been made to classify prisoners by offense or in any other way and that self-appointed prison "leaders" exercised their sovereignty by assigning prisoners to cells. Specifically, there was space for the separation of the four young, white males, but it was not used. The result was to allow Stokes to be vulnerably isolated away from the security of his friends. This was coupled with evidence from which the jury could have concluded that the jailer refused to investigate the screams of Stokes and Shows for help. The indifference to, indeed the acceptance of, fighting in the jail strengthened the hold of the violent prisoners as did the failure to separate Stokes from his assailants or discipline them for their actions when, according to Romero, they learned of the assaults. We will return to the evidence in our review of the punitive damage awards. It is sufficient for now to conclude that ample evidence supported the jury's conclusion that defendants violated Stokes' constitutional rights.

Whether expressed in Fifth or Eighth Amendment terms, this constitutional right is not here translated into segmented obligations such as an obligation to classify prisoners, or to provide adequate space for exercise. That is, this is not a case that addresses what is popularly referred to as jail reform. It is instead a civil suit for compensation for injuries flowing from a deprivation of a basic liberty interest defined by the trial court as the "... right to be reasonably protected from the constant threat of violence and physical assault from his fellow inmates." The trial court, as earlier noted, required a pervasive risk of harm and a failure to take reasonable steps to prevent the known risk.

We are not asked to review the district court's formulation of constitutional duty and we do not decide whether a standard demanding less exacting proof would have been sufficient. We decide today only that the jury's findings under the charge were supported by the evidence and a deprivation of Stokes' rights under the Fourteenth Amendment to the United States Constitution.

### Qualified Immunity

Defendants contend that the trial court erred in denying their motion for directed verdict for the reason that their defense of qualified immunity was sound as a matter of law. We note at the outset that qualified immunity is an affirmative defense that must be pleaded by a defendant. Defendants did not do so here. The trial court denial is sustainable for that reason alone. Regardless of entitlement, the district court did submit a good faith defense to the jury and the jury rejected it. We do not pass upon its correctness but we note that the submission favored defendants in requiring Stokes to prove that the defendants acted without good faith. Nor does the recent change in the formulation of qualified immunity assist the defendants. *See Harlow v. Fitzgerald*, —— U.S. ——, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). That change was the deletion of the subjective good faith component. Since *Harlow*, the inquiry is the objective one of whether the law was clear as to plaintiff's entitlement to the right assertedly taken away. As we explained in *Trejo v. Perez*, 693 F.2d 482 (5th Cir.1982):

[T]he inquiry is what a reasonable officer knew or should have known. The court effectively created a two level progressive inquiry:

(1) Was the law clearly established at the time? If the answer to this threshold question is no, the official is immune.

(2) If the answer is yes, the immunity defense ordinarily should fail unless the official claims extraordinary circumstances and can prove that he neither knew nor should have known that his acts invaded settled legal rights.

*Id.* at 485.

There can be no serious question but that at the time of these assaults it was known that a sheriff owed to his prisoner the constitutionally rooted obligation not to detain him in a manner which made it likely

he would be beaten and sexually assaulted. If such a state of facts existed as the jury here was entitled to find, it was equally entitled to reject the good faith of the defendants, which it did. In sum, defendants received a more favorable submission of their "defense" of good faith than they were legally entitled to. The trial court did not err in refusing to grant a directed verdict in defendants' favor on immunity grounds.

### Punitive Damages

██ Defendants urge that the jury charge regarding punitive damages was improper, that there was insufficient evidence to support them, that they were the product of a quotient verdict, and that they were excessive. The charge stated that if the act or omission "which proximately caused the injury or damage to the Plaintiff ... was maliciously or wantonly or oppressively done, then you may ... add to the award of actual damages such amount as you shall unanimously agree to be proper as punitive damages." The contention is that an award of punitive damages under 42 U.S.C. § 1983 must be supported by proof that the complained-of conduct was intended, and that under this standard there was insufficient evidence to support the verdict. The intentional conduct standard was recently rejected by the Supreme Court in *Smith v. Wade,* —— U.S. ——, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983). In *Smith* a prisoner was beaten and sexually assaulted and an "egregious failure of the guards to protect" the prisoner was found. The Court held that traditional tort standards were proper measures for an award of punitive damages in § 1983 suits and specifically upheld a standard of recklessness for assessing punitive damages under § 1983 over the contended-for intent standard. *Id.* at ——, 103 S.Ct. at 1635. The standard imposed by the trial court of malicious or wanton or oppressive acts here was well within the boundaries of traditional tort standards for assessing punitive damages. It was therefore proper.

██ Alternatively it is urged that there was insufficient evidence to support the award of punitive damages. "Punitive damages are awarded in the jury's discretion 'to punish [the defendant] for his outrageous conduct and to deter him and others like him from similar conduct in the future.' Restatement (Second) of Torts § 908(1) (1977). The focus is on the character of the tortfeasor's conduct—whether it is of the sort that calls for deterrence and punishment over and above that provided by compensatory awards." *Smith v. Wade,* —— U.S. at ——, 103 S.Ct. at 1639.

There was evidence to support the findings of such acts or omissions by both Romero and Delcambre. In addition to those facts earlier recounted, we note that Sheriff Delcambre is charged by law with control and supervision over the Vermillion Parish jails. La.Rev.Stat.Ann. 33:1435 (West 1982). At the time of Stokes' injuries Delcambre knew that he was under a federal order to separate prisoners according to the nature and type of crime with which they were charged.[2] He did not obey this order. He had no written rules for operating the jail and "more or less left it up to the jailers as to how to run the jail." In fact, Delcambre's chief jailer Romero testified that he had never been told to separate the prisoners according to the severity of their charged offense. Regardless of alleged funding difficulties, there was evidence from which the jury could have concluded that sufficient cell space existed to allow the segregation of these four young men from the general jail population.

Delcambre manned the jail with only one jailer despite advice to increase their number. Paul Phelps, an expert in prison administration, testified that a prison the size of Vermillion Parish Jail required three jailers for safe supervision and protection of the prisoners. As we earlier noted, Delcambre's office had requested that the glass viewing panel to the cell block be welded shut with a metal plate because the prisoners had broken the glass with their feet and would throw coffee and other things

---

**2.** The other prisoners were only charged with     these offenses; they had not been convicted.

through the broken window. The metal plate made it impossible for the jailers to view the cell from outside the metal door which separated the jailers' office and the cell. Phelps testified that the welded shut viewing panels combined with the inmate assignments made the prison tremendously dangerous.

Displaying disregard for the safety of the inmates, the sheriff did not tell the jailers about the rape for several weeks after it occurred. Moreover, Sheriff Delcambre testified:

Q. Today, under the same circumstances, you would do the same thing?

A. Yes, I'd do the same thing again.

These acts and omissions provide a sufficient factual basis to sustain the jury's award of punitive damages against Sheriff Delcambre.

The award of punitive damages against Alton Romero is also supported by the record. Romero left Stokes in the cell with his assailant after he was beaten up and failed to even question the assailant, despite the fact that Stokes was bleeding so profusely that he later credibly feigned weakness from loss of blood and obtained the assistance of other prisoners. Romero's own responses to questions at trial exemplify the spirit of disregard which the jury understandably desired to punish. In responding to Stokes' attorney's questions as to why Stokes and his friends were placed with prisoners charged with violent felonies, Romero stated:

A. I don't see that they was any better than the rest of them throwing bottles at people. That's a very dangerous weapon.

Q. Do you think armed robbery is dangerous, sir?

A. It's fairly dangerous.

Q. Fairly dangerous? Do you think aggravated rape is very dangerous?

A. (No response)

Q. Do you?

A. Not that much.

Romero's statement to Wayne Shows sheds a bright light on the manner in which the jail was run:

Q. Did you have any conversation with any jailer as you were coming back from making your telephone call?

A. (By Shows) Yes, sir.

Q. What was the nature of the conversation?

A. He [Romero] said, have they fucked you yet? I said, no, they ain't fooled with me. He said, well don't worry about it, they will.

This evidence read in the light most favorable to the verdict supports the jury's finding that the actions and omissions of Alton Romero and Euda Delcambre were maliciously, wantonly, or oppressively done. We are not at liberty to set aside the decision of this local jury that punitive damage awards were an appropriate response.

■ Defendants urge that even if an award was otherwise proper the amount awarded was excessive. The standard for overturning a jury award on appeal is restrictive: "When approved by the trial judge, such awards will be overturned only when contrary to right reason or for a clear abuse of discretion." *Perricone v. Kansas City Southern Railway Co.,* 704 F.2d 1376, 1382 (5th Cir.1983) (citing case).

■ The jury awarded the plaintiff a total of $310,000 in punitive damages. While the award is certainly on the high side it is not beyond that which on these facts is sustainable. We will not pretend that we hold a precise measure for separating the upper ranges of the acceptable from the unacceptable. Many jurisdictions have made arithmetical comparisons of the compensation and punitive awards such as five or six times the actual damages, although this exercise may be more descriptive of results than productive of analysis. While we do not wholly subscribe to such techniques, they are instructive in describing ranges of historical exercises of appellate judgment. We are persuaded that the award falls within the range of familiar treble damage schemes and is responsive to the level of disregard of human rights this jury was entitled to conclude existed.

■ Defendants final shot at the punitive damage award is that it was the product of a quotient verdict. The sole basis for this assertion is that "the odd numbers of $205,000 and $105,000 make it abundantly clear that the award represent quotients for compromise verdicts." The difference in amounts awarded may properly affect the jury's assessment of the respective responsibility of the defendants. The assertion is frivolous.

### Golden Rule

Defendants urge that plaintiff's counsel committed reversible error by making a Golden Rule final argument. This court has forbidden plaintiff's counsel to explicitly request a jury to place themselves in the plaintiff's position and do unto him as they would have him do unto them. *Loose v. Offshore Navigation, Inc.,* 670 F.2d 493, 496 (5th Cir.1982). The rule's purpose is to reduce the risk of a jury decision based on emotion rather than trial evidence. While we have found that the use of a Golden Rule argument may so taint a verdict as to be grounds for a new trial, *id.* at 496–97, it did not do so here.

■ The use of the Golden Rule argument is improper only in relation to damages. It is not improper when urged on the issue of ultimate liability. *Burrage v. Harrell,* 537 F.2d 837 (5th Cir.1976). The two objected-to uses of the Golden Rule argument requested the jury to put themselves in Stokes' place to determine whether his fears and resultant failure to request help were reasonable. This determination went to the ultimate question of liability, not the amount of damage.

■ Stokes' counsel did without objection in his closing make an arguably forbidden Golden Rule appeal related to damages. We are limited in our review, however, to consideration of those arguments to which objections were leveled. *Skaggs v. J.H. Rose Truck Line, Inc.,* 435 F.2d 695, 696 (5th Cir.1970). We do not decide that such an argument cannot rise to the level of plain error. There was here, however, no repeated impermissible use of the argument technique and we are not

persuaded that any prejudice ran so deep as to warrant a plain error reversal. We have previously stated in another context, "We do not view juries as emotional slot machines and do not suppose them to be so. Instead we review this type of hyperbolic statement with some level of confidence in the maturity of twelve citizens . . ." *United States v. Cochran,* 697 F.2d 600, 607 (5th Cir.1983).

### Voir Dire

■ Defendants next point to claimed errors in the trial court's conduct of voir dire examination, a matter committed to its wide discretion. They first urge that prospective juror Jack Boudreaux prejudiced the panel in asserting that Sheriff Delcambre had been found guilty of something. This argument is built upon a telling of only part of the story. Boudreaux, in response to questions from the court, stated that he had heard about an incident. He said, "It's a vague memory I have concerning Sheriff Euda Delcambre being guilty of something—I don't remember what it was." He then said he did not remember whether it was this incident and that it was his own opinion. On being pressed by the court he stated, "I don't remember if it was this thing here, I just remember him being in the news—some kind of sensational thing." The court excused Boudreaux. Then in opening statement defense counsel, without objection, told the jury with regard to Boudreaux's statement, "For your information, the rape case that was on the radio involved Houma, the Parish of Houma, it had nothing to do with Sheriff Delcambre . . . What he [Boudreaux] heard was a totally different case." We see no abuse of discretion.

■ Defendants also quarrel with the sustaining of a challenge for cause of a prospective juror who knew the sheriff for twenty years and attended some political functions involving him, and in refusing a challenge to a juror whose husband had been employed by the Ibernia Parish Police Jury. These latter assertions are frivolous attacks on the discretion of the trial judge.

*Reputation Evidence*

██ Finally, defendants urge that the trial court erred in sustaining objections to proffered testimony regarding Deputy Alton Romero's reputation for truthfulness. Defendants offered this testimony under Fed.R.Evid. 608. The rub is that under Rule 608(a)(2):

> Evidence of truthful character is admissible only after the character of the witness for truthfulness has been attacked by opinion or reputation evidence or otherwise.

Stokes had not offered such opinion testimony regarding the reputation of Alton Romero. The "attack" upon Romero's credibility at the time of the proffer was only that Shows attributed a statement to Romero and Romero denied making it. This is not such an attack upon character that the trial court abused its discretion in excluding opinion testimony of Romero's reputation for truthfulness.

*Jury View*

██ Defendants' final point is that the trial court erred in refusing a jury view of the jail. Whether a trial is to be interrupted and suffer the inconvenience and risk attendant upon a jury view are matters for the discretion of the trial court and are reviewable only for abuse. We find no abuse here. A trial judge would understandably be reluctant to halt a trial and cause the jurors to be transported to the jail for a view. The security problems are not small and the risk of comment by the prisoners is not insubstantial. While it may well have been helpful there was an abundance of evidence at trial as to the layout of the jail. The trial judge was on the scene and balanced these concerns. We will not second-guess him.

*Conclusion*

We have considered each asserted ground of error and that exercise has made this opinion longer than the difficulty of the case warrants. It is simple. A south Louisiana jail was run in such a manner that a twenty-one year old college student who had never before been arrested was jailed with prisoners known to be dangerous for what at worst was a foolish prank. He was placed in a life-threatening setting and then ignored. While so trapped, he was brutally beaten, raped and humiliated. The indifferent attitude of defendants remained after the events and indeed is palpable in the cold words of the transcript on appeal. Despite Boo Boo's plea of guilty to the sexual assaults, the retrieval of the bloody sheets, Stokes' broken nose and blackened eyes, defense counsel persisted in suggesting at trial by non-subtle questions that if any such assaults occurred they were welcomed. Cross-examination of Stokes opened as follows:

Q. How old were you back at the time this incident occurred?

A. Must have been twenty-one.

Q. Now, sir, are you married today?

A. No sir.

Q. Do you have a girl friend?

A. Very little, yes, sir.

Q. Well, do you date?

A. Yes, sir.

We cite this example because it was an important part of the trial scene. It conveyed, or certainly could have conveyed, the attitude of these defendants toward the assaults upon Stokes while in their custody. The jury had the benefit of Romero's near equating of Stokes' conduct with that of aggravated rape and the explicit evidence that he fully expected the young men would be raped. The jury also had before it defendants' assertion that Stokes could have extricated himself but they rejected it. We do not suggest the absence of evidentiary dispute; we suggest only that a reasonable juror could have so concluded. Apparently they did. We AFFIRM.