958 F.2d 369
 35 Fed. R. Evid. Serv. 406
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Jorge Samuel CRUZ, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Peggy NELSON, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Juan Carlos PEREZ, Defendant-Appellant.
 Nos. 90-5100, 90-5102 and 90-5105.
 United States Court of Appeals, Fourth Circuit.
 Argued Oct. 31, 1991.
Decided March 12, 1992.
 
 Appeals from the United States District Court for the District of South Carolina, at Beaufort. Solomon Blatt, Jr., Senior District Judge. (CR-89-210)
 Argued: Joel B. Rudin, Mass & Rudin, New York City, for appellant Cruz.
 M. Celia Robinson, Columbia, S.C., for appellant Perez.
 Millard C. Farmer, Atlanta, Ga., for appellant Nelson.
 Robert H. Bickerton, Assistant United States Attorney, Charleston, S.C., for appellee.
 On Brief Jeremy Gutman, New York City, for appellant Cruz, Jack B. Swerling, Jennifer Kneece Shealy, Columbia, S.C., for appellant Perez, August F. Siemon, Atlanta, Ga., for appellant Nelson.
 E. Bart Daniel, United States Attorney, Charleston, S.C., for appellee.
 D.S.C.
 AFFIRMED IN PART AND REVERSED AND REMANDED IN PART.
 Before ERVIN, Chief Judge, DONALD RUSSELL, Circuit Judge, and HEANEY, Senior Circuit Judge of the United States Court of Appeals for the Eighth Circuit, Sitting by Designation.
 OPINION
 PER CURIAM:
 
 
 1
 This appeal encompasses multiple issues raised by three criminal defendants, each convicted for their participation in a drug importation and distribution operation. For the reasons explained in this opinion, we affirm the convictions of Jorge Samuel Cruz and Juan Carlos Perez, and we reverse the conviction of Peggy Nelson and remand her case for a new trial.
 
 I.
 
 2
 The facts of this protracted operation are presented chronologically, describing the involvement of each defendant as the story evolves.
 
 
 3
 Peggy Nelson, one of the appellants here, first met David Childs in 1979 through a man she was dating at the time, who was a fraternity brother of Childs. Nelson saw Childs periodically over the next few years at reunions and college football games.
 
 
 4
 Childs had been involved in various drug importation operations since 1976.[1] In 1987, Childs bought a 47-foot sailboat, the ARC, for the purpose of transporting drugs. Prior to purchasing the ARC, he had discussed the idea with Gabriel Taboada, a resident of Columbia and Bonaire,[2] whom he knew from previous drug importing ventures. Taboada had assured Childs that if he bought the boat, Taboada would supply a load of either marijuana or cocaine for Childs to transport. They also discussed the possibility of using the boat for subsequent ventures.
 
 
 5
 After purchasing the boat, Childs flew to Atlanta in late 1987 to recruit Nelson as a crew member for a planned drug run from St. Thomas. Childs wanted a female crew member on board to allay any suspicion of drug running in case of a Coast Guard boarding.
 
 
 6
 At this point in the story, the accounts of Childs and Nelson diverge sharply. Childs testified that he told Nelson the purpose of the trip up front. In exchange for a promised sum of between twenty and thirty thousand dollars, Nelson agreed to be the third crew member for the trip. Tim Smith, a friend of Childs, was the other crew member. According to Childs' plan as allegedly laid out to Nelson, Childs and his wife and infant daughter would take the ARC on a pleasure cruise from South Carolina to St. Thomas, where the wife and daughter would leave the boat and fly back to South Carolina. Meanwhile, Nelson would fly to St. Thomas to meet Childs and the boat. She was given $3,000 in advance for expenses.
 
 
 7
 Continuing with Childs' account, on March 22, 1988, Nelson joined the Childs family and Tim Smith aboard the ARC in St. Thomas. She was informed then that they would be carrying cocaine instead of marijuana, as previously planned, but that she would receive more money for accepting the risk of a higher punishment if caught. Nelson agreed to the change of cargo. Childs' wife and daughter soon left the boat to fly home, before any drugs were loaded.
 
 
 8
 Work then began to prepare storage areas on board for the cocaine. According to Childs, he, Smith and Nelson all worked to convert the water tanks into drug storage areas. Consequently, the interior of the boat was in disarray and the use of fresh water on board was severely limited. The work being done could not have escaped notice by any on board.
 
 
 9
 Upon finishing the renovations, the crew sailed the ARC to Bonaire to pick up the cocaine. Childs testified that Nelson helped hide the cocaine, just under 500 kilograms in quantity, in the water tanks. Nelson then caulked around the water tank lids so they would not be noticed in the event of a Coast Guard boarding.
 
 
 10
 Childs, Smith and Nelson sailed the ARC back to Hilton Head. Childs alleges that upon arrival, Nelson rented a car to transport the cocaine to a stash house, helped dismantle the interior of the boat to access the cocaine, packed the cocaine for movement from the boat, and then helped store it at the stash house. Nelson then returned home, taking with her a small amount of cocaine and $500 cash. Nelson returned to the stash house a second time to collect additional money. Childs later met Nelson along an interstate highway in Georgia and paid her the rest of the $50,000 she was owed.
 
 
 11
 Nelson explains her participation in the venture quite differently. She testified that Childs asked her to join his family on a sailing trip in order to care for the Childs' infant daughter. She denied having any knowledge of a plan to import cocaine or other drugs at any time. She admitted working on the boat's water tanks, but only for the express purpose of repair. During the time the drugs were loaded onto the boat, Nelson claims to have stayed at a hotel on the island of Bonaire. She testified that she did not learn of the smuggling until Childs' arrest in July 1989, over a year after the venture, when she was informed of his arrest by a mutual friend.
 
 
 12
 Childs made a second, similar drug run just over a year later with two other crew members. Childs returned to Hilton Head from this second run on July 19, 1989, with 502 kilograms of cocaine and stored it in a stash house on the island.
 
 
 13
 Luis Taboada, the brother of the supplier Gabriel Taboada, had been engaged to arrange distribution of this second load of cocaine. On July 25, Luis Taboada made contact with Jorge Samuel Cruz (Cruz), the second appellant in this case, as previously arranged at a motel on Hilton Head. The two were to coordinate transportation of the cocaine recently imported by Childs. For his part, Cruz had driven an 18-wheel truck to an expressway exit, left it there, and driven a rented van to the motel room. Cruz gave Luis Taboada the keys to the van, which Luis Taboada in turn gave to Childs with instructions to load 261 kilograms of cocaine, packed in suitcases, into the van and return it to the motel parking lot.
 
 
 14
 The next morning Luis Taboada called Cruz to tell him that Childs was on his way to the motel with the van. As Childs drove to the motel parking lot, DEA agents, who had been informed of the arrangements by Richard Johnson, a crew member on the second voyage, arrested him. The DEA agents confiscated the cocaine, returned the empty suitcases to the van and drove the van to the motel parking lot according to plan. A short time later, Cruz and another man, later identified as co-appellant Juan Carlos Perez, walked up to the van, looked through the windows, and then continued walking around the motel to where their car was parked. Both were immediately arrested. FBI agents then seized the empty 18-wheel truck Cruz had left parked at the expressway exit. Subsequent cooperation by Childs led to the arrest of Nelson and other participants in the illicit operations.
 
 
 15
 The government proceeded with a joint trial of several defendants.[3] Juries convicted both Jorge Samuel Cruz and Juan Carlos Perez of conspiracy to possess in excess of five kilograms of cocaine with intent to distribute and substantive possession with intent to distribute in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), 846 and 18 U.S.C. § 2. The jury convicted Peggy Nelson of conspiracy to import in excess of five kilograms of cocaine, substantive importation, conspiracy to possess cocaine with intent to distribute, and substantive possession with intent to distribute in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), 846, 952, 960(a)(1), 960(b)(1), 963 and 18 U.S.C. § 2.
 
 
 16
 On appeal, Cruz challenges (1) the sufficiency of the evidence to establish a single conspiracy, as charged in the indictment, encompassing both importation ventures; (2) the trial court's refusal to give his proffered jury instruction; and (3) the trial court's admission of prior bad acts evidence.
 
 
 17
 Perez challenges the district court's finding that there was probable cause to arrest him and its consequent refusal to suppress evidence obtained as the fruits of such illegal arrest.
 
 
 18
 Nelson appeals the trial court's refusal to allow witness testimony as to her truthful character as permitted by Rule 608(a) of the Fed.R.Evid.
 
 II.
 Jorge Samuel Cruz
 
 19
 A. Cruz first contends that the government's evidence was insufficient to establish a unitary conspiracy from the separate 1988 and 1989 drug ventures. He highlights the government's inability to show a single agreement to conduct multiple drug importation ventures. The evidence, he argues, instead shows separate agreements, distinguished by time and the parties involved.
 
 
 20
 Even though Cruz has ample evidence to support his multiple conspiracy argument, he has not met the higher standard one faces on appeal of a jury verdict. In deciding sufficiency of evidence appeals, we view evidence in the light most favorable to the government. The conviction below should be overturned only if the evidence, so viewed, would not allow a reasonable jury to convict defendant. United States v. Urbanik, 801 F.2d 692, 695 (4th Cir.1986) (emphasis added).
 
 
 21
 The question of whether a single conspiracy exists is one of fact within the province of the jury. United States v. Leavis, 853 F.2d 215, 218 (4th Cir.1988). A single conspiracy can be found in a case involving multiple transactions where there is an overlap of key actors, methods and goals, indicating one overall agreement or one general business venture. Id.; United States v. Crockett, 813 F.2d 1310, 1317 (4th Cir.), cert. denied, 484 U.S. 834 (1987). In Crockett, we found no error in the district court's determination that a single conspiracy existed where "[t]he conspiracy had the same objective, it had the same goal, the same nature, the same geographic spread, the same results, and the same product." 813 F.2d at 1317. Furthermore, any particular coconspirator "need not be involved in every phase of [the] conspiracy to be deemed a participant" in a single, ongoing conspiracy. Leavis, 853 F.2d at 218.
 
 
 22
 We find the evidence in this case sufficient for a reasonable jury to find a single conspiracy. Childs, Taboada and Luis Taboada were key actors in both the 1988 and 1989 importations. The importation activities were identical on both trips, including the pick-up point, the amount of cocaine transported, the means of transportation and the destination for off-loading. In addition, Childs and Taboada linked the two ventures financially when they agreed to use the proceeds from a second operation to cover a loss of some cocaine on the first trip.[4] B. Cruz next raises two challenges to the district court's jury charge on conspiracy. First, he challenges the court's refusal of his requested jury instruction, which emphasized the necessity of finding an agreement to convict for conspiracy.[5] Then, he challenges the court's charge given to the jury that a conspiracy is presumed to continue until it is abandoned, its objectives are achieved or its purposes defeated.
 
 
 23
 We find that the district court judge properly charged the jury on both issues. The judge rejected Cruz's requested instruction as cumulative, given the court's already comprehensive charge on the necessary elements of conspiracy. Regarding Cruz's second challenge, the judge again properly charged the jury from Fourth Circuit law. This Court in Leavis, 853 F.2d at 218, stated that "[a] conspiracy ... is presumed to continue until there is affirmative evidence of abandonment or defeat of its purposes." The court's given instruction, which included achievement of a conspiracy's objectives as an indicator of termination of a conspiracy, was more favorable to Cruz than the law as stated in Leavis. In neither instance did the district court judge abuse his discretion in formulating the jury charge.
 
 
 24
 C. Cruz's final contention on appeal concerns the trial court's admission into evidence of prior bad acts. The government introduced evidence at trial that the seized 18-wheel truck was registered in the name of Jose Manuel Barnez. It showed that Cruz had used this fictitious name when he applied for a California identification card in 1988. The government also introduced evidence, over objection, that Cruz had used another fictitious name in 1980 and had once asked an undercover FBI agent for assistance in acquiring false passports and identification.
 
 
 25
 Rule 404(b) prohibits use of prior bad acts to "prove the character of a person in order to show action in conformity therewith." Fed.R.Evid. 404(b). Evidence of prior bad acts may, however, be admitted where such evidence is "(1) relevant to an issue other than character, (2) necessary, and (3) reliable." United States v. Rawle, 845 F.2d 1244, 1247 (4th Cir.1988). If the evidence meets all three requirements, the court must then determine if its probative value outweighs its prejudicial effect. A district court's decision to admit evidence of prior bad acts should be reviewed for abuse of discretion. Id.
 
 
 26
 Evidence of Cruz's prior use of the fictitious name Jose Manuel Barnez was properly admissible under Rule 404(b). The evidence was necessary to show his connection to the 18-wheel truck found parked at the interstate exit. In addition, the evidence was relevant to the issue of guilt, since use of false identification in the conduct of criminal activities can be considered as evidence of knowing involvement. See United States v. Guerrero, 756 F.2d 1342, 1347 (9th Cir.), cert. denied, 496 U.S. 934 (1984). Furthermore, we do not find this evidence unduly prejudicial.
 
 
 27
 However, evidence relating to the 1980 deceptions should not have been admitted under Rule 404(b). This evidence was not probative of any issue relevant to the present charges, leaving us to presume that it was presented only to show deceitful character and Cruz's action in conformity therewith on this particular occasion. We do not find, however, that this evidentiary error amounts to prejudicial error warranting reversal.
 
 
 28
 For the above reasons, we affirm the conviction of Cruz.
 
 III.
 Juan Carlos Perez
 
 29
 It is with great hesitancy that we affirm the conviction of Perez. The scant evidence supporting probable cause for his arrest, and supporting the government case at trial, was sufficient, although barely so.
 
 
 30
 Perez challenges the district court's denial of his motions to suppress post-arrest statements and to suppress his consent to search the 18-wheel truck on the ground that they were the product of an arrest not supported by probable cause. At the time of Perez's arrest, government agents knew only that Luis Taboada had conferred with a Spanish-speaking man staying in the motel regarding delivery of 261 kilograms of cocaine. They then observed Perez, as one of two Latino men who stopped to look in the van supposedly containing cocaine, before continuing on a circuitous route to their car parked on the other side of the motel.
 
 
 31
 A warrantless arrest is subject to the same probable cause analysis as the issuance of a warrant. Wong Sun v. United States, 371 U.S. 471, 479 (1963). The determination of probable cause is judged by the practical assessment of the totality of the circumstances. Illinois v. Gates, 462 U.S. 213, 230 (1983); United States v. Garcia, 848 F.2d 58, 59-60 (4th Cir.), cert. denied, 488 U.S. 957 (1988). An officer has probable cause for arrest when, at the time of the arrest, the circumstances within his knowledge would warrant belief by a prudent person that the suspect has committed, is committing or is about to commit an offense. Michigan v. DeFillippo, 443 U.S. 31, 37 (1979); United States v. Manbeck, 744 F.2d 360, 376 (4th Cir.1984), cert. denied, 469 U.S. 1217 (1985). The Court should review under a clear error standard the district court's finding of probable cause to arrest Perez. United States v. DePew, 932 F.2d 324, 327 (4th Cir.), cert. denied, 112 S.Ct. 210 (1991).
 
 
 32
 In light of all the facts known to DEA agents prior to Perez's arrest, we cannot say that a finding of probable cause was clearly erroneous. The sight of two men who take a suspiciously circuitous route to their car and who, for no apparent reason, stop to look inside a van supposedly loaded with cocaine, would arouse belief of guilt in a reasonable person.
 
 
 33
 Having upheld the legality of the arrests, the products of that arrest are, therefore, lawful absent a showing by defendant of undue duress. Perez attempts no such showing.
 
 
 34
 We, therefore, affirm the conviction of Perez.
 
 IV.
 Peggy Nelson
 
 35
 We reverse the conviction of defendant Nelson because we find the district court's denial of her right to present witnesses as to her truthful character prejudicial error.
 
 
 36
 At trial, the government sought to discredit Nelson's testimony explaining her role in the sailboat trip. It called witnesses to the stand whose testimony directly conflicted with that of Nelson's, used prior inconsistent statements in an attempt to impeach her testimony, and, in its closing argument, presented her as a calculating, deceitful person who had willingly concealed her involvement in Childs' drug operation. After the government's successful cross examination, Nelson sought to call several witnesses on her behalf to rehabilitate her character for truthfulness. The trial court refused Nelson's request. The court ruled that the cross-examination of Nelson was insufficiently "slashing as to constitute an attack on the credibility of this witness under [Rule] 608." (Tr. at 1522-23).
 
 
 37
 Federal Rule of Evidence 608(a) limits a witness's opportunity to introduce evidence of his or her truthful character. Rule 608(a) provides:
 
 
 38
 The credibility of a witness may be attacked or supported by evidence in the form of opinion or reputation, but subject to these limitations: (1) the evidence may refer only to character for truthfulness or untruthfulness, and (2) evidence of truthful character is admissible only after the character of the witness for truthfulness has been attacked by opinion or reputation evidence or otherwise.
 
 
 39
 Thus, a witness may only introduce evidence of truthful character in order to repair credibility after a direct attack to the truthful character of the witness. Otherwise, we presume the witness's truthful disposition and will not consume judicial resources with needless proof. Fed.R.Evid. 608 advisory committee's note.
 
 
 40
 Clearly, direct affronts to veracious character in the form of testimony by character witnesses or questions about prior bad acts or prior convictions involving dishonesty constitute an attack under 608(a), justifying admission of restorative character evidence. Less clear, however, are the situations where untruthful character is implied through impeachment of a witness by prior inconsistent statements, by presentation of contradictory evidence or by suggestive comments. These cases are given to the discretion of the trial judge to determine on a case-by-case basis when restorative character evidence may be admitted. See, e.g., Stokes v. Delcambre, 710 F.2d 1120, 1129 (5th Cir.1983); United States v. Medical Therapy Sciences, Inc., 583 F.2d 36, 41 n. 6 (2d Cir.1978), cert. denied, 439 U.S. 1130 (1979).
 
 
 41
 Since no bright-line rules govern this area, we look to the holdings in other cases to determine parameters for our case. It is generally agreed that merely impeaching a witness by prior inconsistent statements or contradictory evidence does not impugn the witness's truthful character. See Stokes, 710 F.2d at 1129; United States v. Danehy, 680 F.2d 1311, 1314 (11th Cir.1982); United States v. Angelini, 678 F.2d 380, 382 n. 1 (1st Cir.1982); United States v. Jackson, 588 F.2d 1046, 1055 (5th Cir.1979), cert. denied, 442 U.S. 941 (1979). Such impeachment usually attacks only the witness's veracity in a specific case, and not his or her general character for truthfulness. See United States v. Dring, 930 F.2d 687, 691 (9th Cir.1991). However, where prior inconsistent statements are used to show conscious and deliberate deception, such implicates questions of character. See 3 David W. Louisell & Christopher B. Mueller, Federal Evidence § 308 (1979); see Beard v. Mitchell, 604 F.2d 485, 503 (7th Cir.1979). Similarly, when cross examination is "slashing" or is suggestive by insinuation of untruthful character, such cross examination will likely, in the eyes of the jury, disparage the general character of the witness. Louisell & Mueller, supra, § 308; see Angelini, 678 F.2d at 382 n. 1; Medical Therapy Sciences, 583 F.2d at 41 n. 6; United States v. Scholle, 553 F.2d 1109, 1123 (8th Cir.), cert. denied, 434 U.S. 940 (1977). In these and similar situations, due process would require that a witness be given the opportunity to rebut such attacks on his or her truthful character with favorable character evidence.
 
 
 42
 In the instant case, the government's cross examination of Nelson and its presentation of evidence through other witnesses clearly implicated her truthful character. The prosecutor attempted to show through prior inconsistent statements not only that Nelson's testimony on the stand was incredible, but also that the jury should not give credence to any of her testimony since she had lied in the past to her friends, law enforcement officers and the magistrate judge concerning her involvement with Childs.[6] Through other witnesses, the government painted a picture of Nelson as a calculating, deceitful person.[7] These statements discredit her presumed honest character. It was error not to permit Nelson an opportunity to rebut these allegations with character witnesses.
 
 
 43
 In the context of this case, the error cannot be excused as harmless. See 28 U.S.C. § 2111 (1988); Fed.R.Crim.P. 52(a). Nelson's defense rested entirely on her testimony explaining her participation in the sailboat trip. The jury's determination of her credibility was crucial to its decision. We cannot find beyond a reasonable doubt that the jury would have reached the same outcome given evidence of Nelson's truthful character.
 
 
 44
 Accordingly, we reverse the conviction of Peggy Nelson and remand for a new trial.
 
 
 45
 In conclusion, we affirm the convictions of Cruz and Perez, finding no prejudicial errors in their trials. We reverse the conviction of Nelson and remand for a new trial because errors in excluding testimony as to her truthful character prejudiced her trial.
 
 
 46
 AFFIRMED IN PART; REVERSED AND REMANDED IN PART.
 
 
 
 [1]
 Childs testified concerning his past drug smuggling activities pursuant to a plea agreement
 
 
 [2]
 Bonaire is an island in the Netherlands Antilles
 
 
 [3]
 Perez's case was subsequently severed from the joint trial of Cruz and Nelson and tried separately
 
 
 [4]
 In the 1988 operation, 600 kilograms of cocaine were delivered to the ARC for transport. When Childs learned that the water tanks would hold only 480 kilograms, and that the source of delivery refused return of any kilograms, he dumped the excess overboard
 After arriving in Hilton Head, Childs met Taboada in New York, where they discussed the cocaine thrown overboard. They agreed that Childs would pay a total of one half of the loss, one quarter at that time and another quarter upon working again.
 
 
 [5]
 Cruz-Requested Jury Instruction Number 2 states:
 The law requires more than a conspiracy to attempt to arrange an illegal act; it requires an agreement to carry out an illegal act, in this case in Count IV the possession with intent to distribute cocaine.
 (Joint App. at 353.)
 In his argument disputing the government's charge of a single conspiracy Cruz contends that a nascent discussion by Childs and Taboada about using the ARC for numerous drug runs does not rise to the level of an agreement needed to show conspiracy.
 
 
 [6]
 See, e.g., Tr. at 1511-12, 1517, 1519-20
 
 
 [7]
 Childs testified that he wanted a woman on the trip in case of a Coast Guard boarding and that he thought Nelson could handle a Coast Guard boarding "very well." (Tr. at 150-51, 206.)
 Lynn Childs testified that Nelson lied to her friends about the boat trip so that no one would suspect drug smuggling. (Tr. at 469-70.)