**Rita F. MARSH, Plaintiff–Appellant, Cross–Appellee,**

v.

**Dorothy ARN, et al., Defendants–Appellees,**

**Delores Furrow, Defendant–Appellee, Cross–Appellant.**

**Nos. 89–3415, 89–3449.**

United States Court of Appeals, Sixth Circuit.

Argued Nov. 14, 1990.

Decided June 25, 1991.

Rehearing and Rehearing En Banc Denied Sept. 23, 1991.

---

* Hon. Eugene E. Siler, Jr. undertook active duty as a member of this court on September 16, 1991 but did not participate in voting on this matter.

Edward L. Gilbert (argued), Akron, Ohio, for plaintiff-appellant, cross-appellee.

Gary D. Andorka (argued), Office of the Atty. Gen. of Ohio, Columbus, Ohio, for defendants-appellees.

Before KENNEDY and MILBURN, Circuit Judges, and ENGEL, Senior Circuit Judge.

ENGEL, Senior Circuit Judge.

This litigation arises from an incident which occurred on December 20, 1985 at the Ohio Reformatory for Women when plaintiff Rita F. Marsh was attacked and severely beaten by a fellow inmate. Thereafter, Marsh brought suit against a num-

ber of prison employees and officials charging them with acts and omissions which she alleged amounted to a deliberate indifference to her security needs as a state prisoner and were thus violative of her rights to be free from cruel and unusual punishment under the eighth amendment to the constitution. In these appeals we are called upon to measure those acts and omissions of the defendants, viewed in the light most favorable to the prisoner, but against the constitutional standard of deliberate indifference as it was established at the time the assault took place. For the reasons that follow, we affirm the district court's grant of JNOV as to four of the defendants and reverse the denial of JNOV as to defendant Delores Furrow.

## I.

On August 9, 1985, Rita Marsh arrived at the Ohio Reformatory for Women ("ORW") to serve a sentence on convictions for two theft offenses and carrying a concealed weapon. This was Marsh's first experience in prison. Around September 27, 1985, Marsh was assigned to a six-bed dormitory room in Lincoln Cottage, a residential hall in the institution. One of Marsh's roommates was Tonya Leonard, a repeat offender who was serving her second sentence at ORW. Leonard's criminal record included convictions for felonious assault, carrying a concealed weapon, theft, and prostitution. Leonard's prison record included a variety of offenses, two of which were for fighting without a weapon with another inmate which apparently resulted in no injuries. There was no evidence she had ever assaulted, *i.e.* unilaterally provoked and attacked, another inmate.

In October 1985, Marsh requested to be reassigned to another dormitory room, and she was accordingly placed on a waiting list. Over the next few months Marsh and Leonard were involved in several arguments. During this period of time, Marsh asserts that she began telling certain correctional officers and prison officials about problems she was having with Leonard. These included general threats and other minor incidents instigated by Leonard. On December 20, 1985, Leonard attacked Marsh in their dorm room, beating her on the head with a metal combination lock. Marsh eventually escaped from Leonard by locking herself in the bathroom. Marsh was treated for a concussion, a basal skull fracture and for lacerations to her head. Additional facts as to the relationship among the various parties to this law suit and the events leading up to the assault on Marsh are noted in the remainder of this opinion where pertinent.

After her release from prison Marsh brought this section 1983 action against fourteen employees and officials of ORW, alleging that they failed to protect her from Leonard's attack in violation of her eighth amendment right to be free from cruel and unusual punishment. Prior to trial, the district court granted summary judgment for five of the defendants, but denied summary judgment as to all other defendants.

A jury trial resulted in verdicts in favor of four of the defendants and against defendants Betty Amis, Dorothy Arn, Delores Furrow, Anthony Graves and Mary Morse (collectively "defendants"). The jury awarded Marsh compensatory damages in the amount of $45,000 and punitive damages in the amount of $5,000 against each of the five defendants.

Defendants filed motions for JNOV or, in the alternative, for a new trial. The district court granted JNOV for defendants Amis, Arn, Graves and Morse, finding that the evidence failed to show that any of these defendants had actual knowledge of a genuine risk of serious injury to Marsh. The lower court, however, denied JNOV for defendant Furrow, finding that the evidence demonstrated Furrow had actual knowledge of a genuine threat of serious physical harm to Marsh and that Furrow was not entitled to qualified immunity.

The district court also conditionally granted a new trial for defendants Amis, Arn, Graves and Morse pursuant to Federal Rule of Civil Procedure 50(c)(1), stating that "should [it] be determined that these defendants or any of them were not entitled to judgment notwithstanding the ver-

dict, then this Court would grant their alternative motion for a new trial on the grounds that the verdicts against them were against the weight of the evidence." However, the district court denied defendant Furrow's motion for a new trial, and entered final judgment in favor of Marsh against Furrow for compensatory damages in the amount of $45,000 and punitive damages in the amount of $5,000. Marsh filed a timely notice of appeal, and Furrow filed a timely notice of cross-appeal.

The specific issues on appeal are (1) whether the district court erred by granting JNOV and conditionally granting a new trial for defendants Amis, Arn, Graves and Morse; (2) whether the district court erred by denying defendant Furrow's motion for JNOV or, in the alternative, a new trial; and (3) whether defendants are entitled to qualified immunity. Because we affirm the district court's grant of JNOV for defendants Amis, Arn, Graves, and Morse under the current standard of liability, it is unnecessary to review the conditional grant of a new trial or the defense of qualified immunity as to these defendants. Likewise, we need not consider whether defendant Furrow should be granted a new trial since we find, contrary to the district court's ruling, that she is entitled to qualified immunity.

## II.

 "The issue raised by a motion for a judgment notwithstanding the verdict is whether there is sufficient evidence to raise a question of fact for the jury." *Ratliff v. Wellington Exempted Village Schools Bd. of Educ.*, 820 F.2d 792, 795 (6th Cir.1987). When reviewing a district court's decision to grant or deny JNOV, we apply the same standard used by the district court. *Id.* Accordingly, in testing the sufficiency of the evidence, we "may neither weigh the evidence, pass on the credibility of witnesses nor substitute [our] judgment for that of the jury." *Id.* "Rather, the evidence must be viewed in the light most favorable to the party against whom the motion is made, drawing from that evidence all reasonable inferences in his favor." *Id.* If the evidence "points so strongly in favor of the movant that reasonable minds could not come to a different conclusion, then the motion should be granted." *Id.*

 In determining whether defendants have violated Marsh's eighth amendment right by failing to protect her from Leonard's assault, the applicable legal standard is "whether the defendants' conduct amounted to a 'deliberate indifference' to a risk of injury to the plaintiff." *Roland v. Johnson*, 856 F.2d 764, 769 (6th Cir.1988). The deliberate indifference standard, first articulated in *Estelle v. Gamble*, 429 U.S. 97, 104, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976), has since been extended "to impose upon both federal and state correctional officers and officials the obligation to take reasonable steps to protect inmates from violence at the hands of other inmates." *Goka v. Bobbitt*, 862 F.2d 646, 649 (7th Cir.1988).

In defining "deliberate indifference," the Supreme Court has explained that while an "express intent to inflict unnecessary pain is not required, ... [i]t is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments clause." *Whitley v. Albers*, 475 U.S. 312, 319, 106 S.Ct. 1078, 1084, 89 L.Ed.2d 251 (1986). *See also Roland*, 856 F.2d at 769 (conduct which is obdurate and/or wanton involves recklessness or callous neglect); *Goka*, 862 F.2d at 650 ("Recklessness, in the pertinent sense, 'implies an act so dangerous that the defendant's knowledge of the risk can be inferred....'") (citation omitted); *Clark v. Taylor*, 710 F.2d 4, 9 (1st Cir.1983) (prison official liable under § 1983 where conduct reflects reckless or callous indifference to rights and safety of prisoners in his charge).

In addition to setting forth the requirement that the acts of defendants must have been the proximate cause of damages sustained by plaintiff, the district court instructed the jury that to establish deliberate indifference Marsh had to show that:

1) a defendant had actual knowledge of a genuine risk that plaintiff was going to be seriously injured, and

2) that the defendant consciously refused to take steps to protect plaintiff from the injury.

At oral argument, counsel for Marsh stated that Marsh was not challenging the jury instructions *per se* even though he alleges he did so at the trial level. However, Marsh does argue that the district court "elaborated and applied" the deliberate indifference standard too narrowly by ruling on the motion for JNOV as to Amis, Arn, Morse and Graves that "the evidence was insufficient to find that those defendants 'had actual knowledge of a genuine risk' that Rita Marsh would be seriously injured by Tonya Leonard." Cases cited in Marsh's appellate brief suggest that recklessness in the criminal sense, more specifically the presence of danger so great that knowledge can be inferred, also should qualify for the knowledge component of the deliberate indifference standard of liability.[1] In any event, whether we examine the evidence against each defendant only under the standard of liability stated in the jury instructions or whether we also include recklessness as defined in the cases cited above, does not alter the outcome in this case.

1. Betty Amis

■ Defendant Amis was a shift supervisor at ORW, holding the rank of captain, and she was responsible for supervising correctional officers. Amis' responsibilities included serving as duty officer in rotation with other shift supervisors. As a duty officer she had the authority to place an inmate in the infirmary or in security control, a form of confinement used to remove inmates from the general inmate population.

Amis was the duty officer on the night that Leonard attacked Marsh, but Amis was at home on call when the attack occurred. Marsh testified that at sometime prior to the day of the incident she asked Amis how she could get out of the room she shared with Leonard. Amis referred her to a sergeant at the dorm. Marsh also asserts that Amis knew of Leonard's history of fighting at the institution. However, there is no evidence that Amis had actual knowledge of any threat of injury made by Leonard against Marsh. Nor would it be appropriate to infer such knowledge and categorize her conduct as reckless, given the condition of ORW as portrayed by the record.[2]

Viewing the evidence in the light most favorable to Marsh, it establishes only that Amis knew of Leonard's previous two fights among inmates and that she knew Marsh wanted to change rooms. This evidence is insufficient to raise a jury question as to whether Amis had actual knowledge of a genuine, or has one court put it, a "specific" risk of harm to Marsh. *See Ruefly v. Landon,* 825 F.2d 792, 794 (4th Cir.1987) (while complaint alleged officials generally knew other inmate to be a violent person because he had engaged in two fights with other inmates one of whom he threatened to kill, it failed to allege that they acted in deliberate indifference to specific known risk of harm to assaulted inmate).[3] Therefore, we hold that the district court properly granted JNOV for defendant Amis.

---

1. *See, e.g., Morgan v. District of Columbia,* 824 F.2d 1049, 1057–58 (D.C.Cir.1987). *Cf. Shelby County Jail Inmates v. Westlake,* 798 F.2d 1085, 1093 & n. 10 (7th Cir.1986) (approving a jury instruction that in order for officials to be liable they must "intentionally inflict" cruel and unusual punishment or act in "callous indifference," the latter of which is proven by a pervasive risk of harm from other inmates to which officials fail to reasonably respond knowing of that risk); *Redmond v. Baxley,* 475 F.Supp. 1111, 1117 (E.D.Mich.1979).

2. *See infra* subsection II(2) (discussion on whether there was a pervasive risk of harm at the ORW which would allow a jury to infer that defendant Arn had knowledge of a genuine risk of harm to Marsh).

3. Judge Graham defined a "genuine" risk as "a real risk, not an imagined or hypothetical risk." In our view, we do not see any substantive distinction between Judge Graham's definition and the one which the Seventh Circuit used in *Ruefly.*

## 2. Dorothy Arn

■ Defendant Arn was the superintendent of ORW until 1987, when she retired. Marsh asserts that Arn was responsible for certain institutional policies which contributed to her injury. Marsh first contends and Arn acknowledges that ORW did not have a policy of segregating inmates according to the nature of their offense or their tendency for violence. Marsh asserts that ORW did assign inmates a security rating based upon their criminal record and their conduct at the institution, but these ratings were not consulted in assigning the inmates to rooms. Upon her admission to ORW in August of 1985, Marsh received a *minimum* security rating. In July of 1985, Leonard received a *medium* security rating. Accordingly, Marsh contends that she and Leonard should not have been placed in the same room.

Failure to segregate violent inmates from non-violent inmates has been held to constitute "deliberate indifference" and thus to violate the eighth amendment where there is a "pervasive" risk of harm or where the victim belonged to an "identifiable" group of prisoners for whom risk of assault is a serious problem of substantial dimension. *See Walsh v. Mellas*, 837 F.2d 789, 793–94 (7th Cir.1988); *Martin v. White*, 742 F.2d 469, 474–75 (8th Cir.1984). While Arn testified that she had authority to set policy for the institution,[4] her failure to segregate the inmates does not, in our opinion, result in "deliberate indifference." Unlike *Walsh*, where plaintiff was a member of an identifiable group of prisoners for whom risk of assault was a serious

problem, and *Martin*, where a pervasive risk of harm was proved by an excessive number of assaults,[5] there was no such evidence here. Nor was there evidence that there were more assaults among ORW inmates because prisoners in these classifications were housed together. *Compare Vosburg v. Solem*, 845 F.2d 763, 766–67 (8th Cir.1988) (fact plaintiff was assaulted on four separate occasions and a number of other young inmates were sexually assaulted provided sufficient evidence to support jury finding that prison officials were liable under eighth amendment for failure to develop administrative policies which could protect plaintiff and other potential victims, such as the segregation of inmates according to their offenses and better supervision of inmates' cells and isolated areas of penitentiary) *with Ruefly*, 825 F.2d at 794 (without other evidence of risk of harm to victim, defendants may have been negligent, but not deliberately indifferent, in allowing inmate with known violent tendencies to remain among general population).

■ Arn acknowledged responsibility for a second policy identified by Marsh as allegedly contributing to her injury. On July 1, 1984, Arn issued Post Order No. 11 which prohibited opening an inmate's door after lockup without a male correctional officer being present. Arn testified that this order was instituted for security reasons in response to incidents in which female correctional officers had been attacked by inmates upon opening cell doors.

Marsh contends that this order delayed female correctional officers from interven-

---

**4.** The district court found that the evidence failed to indicate whether Arn established the policy of *not* separating violent from non-violent offenders or whether the Ohio Department of Rehabilitation and Correction instituted it bureau-wide. The jury, therefore, could have reasonably concluded she had that authority and her failure to do so was a proximate cause of Marsh's injury. However, for the reasons stated in the text of the opinion we do not find that Arn's conduct satisfies the relevant standard of liability.

**5.** The Fourth Circuit clarified the definition of a "pervasive" risk of harm, stating:

> A pervasive risk of harm may not ordinarily be shown by pointing to a single incident or

isolated incidents, but it may be established by much less than proof of a reign of violence and terror in the particular institution ... It is enough that violence and sexual assaults occur ... with sufficient frequency that ... prisoners ... are put in reasonable fear for their safety and to reasonably apprise prison officials of the existence of the problem and the need for protective measures.

> It is not necessary to show that all prisoners suffer a pervasive risk of harm. It is enough that an identifiable group of prisoners do, if the complainant is a member of that group. *Martin*, 742 F.2d at 474 (quoting *Withers v. Levine*, 615 F.2d 158, 161 (4th Cir.1980)).

ing on the night she was attacked by Leonard because they had to wait for the arrival of the male officer who patrolled the grounds. At the trial, evidence was presented which indicated that the attack might have lasted approximately thirty seconds and that Marsh had already locked herself in the bathroom when the first female correctional officer arrived at the room. If the attack in fact ceased before the female correctional officers arrived, Post Order No. 11 would not have contributed to Marsh's injury even if Arn was responsible for establishing that policy. *See Williams v. Willits*, 853 F.2d 586, 590 (8th Cir.1988).

In any event, the record contains no evidence that Post Order No. 11, or for that matter the lack of a policy to separate inmates according to their offenses, ever resulted in an injury to an inmate prior to Leonard's attack on Marsh. Hence, even if there was a nexus between Post Order No. 11 and this particular attack, we would be hard pressed to find "deliberate indifference." *Cf. Roland*, 856 F.2d at 770 (in reviewing a motion for summary judgment, the Sixth Circuit found that liability could be imposed upon two defendants who, despite their decision making authority *and* knowledge of a high level of violence and several assaults, allowed policies to exist which (1) permitted dangerous inmates to hold positions of "honor," and (2) discouraged the reporting and prosecution of assaults). Again, there was no evidence of a high level of violence and/or assaults at the ORW.

Marsh also contends that Arn was personally aware of the problems she was having with Leonard. Marsh testified that in late November of 1985 she approached Arn on institution grounds and asked for help in getting out of the dorm room she shared with Leonard. While Arn testified that she did not recall this contact, the jury did not have to believe her. However, plaintiff's alleged contact with Arn was limited. Marsh testified that she told Arn she was having trouble with Leonard who had threatened her and was aggravating her. Marsh, however, did not inform Arn of any genuine or specific risk of harm to

Marsh. Arn acknowledged that she was generally aware of Leonard's disciplinary record as an inmate, but she said that Leonard's record was not particularly unusual. Arn explained that it was fairly common for an inmate to be involved in two or more fights during her confinement, and this conduct did not warrant removing an inmate from the general population because of a lack of room to accommodate the number of women who could fit into this category. No evidence in the record contradicts Arn's opinion of Leonard's record. Clearly, when the evidence is viewed in the light most favorable to Marsh, Arn still did not have the requisite knowledge of a genuine or specific risk of harm for an eighth amendment violation. Accordingly, the district court's grant of JNOV for defendant Arn is affirmed.

### 3. Mary Morse

■ As inmate personnel officer at ORW, defendant Morse was responsible for making room assignments for the inmates. Because most inmates wanted a single room, Morse assigned single rooms on a first come, first served basis. Inmates could request reassignment by sending a "kite" to Morse. In October of 1985, Morse received a kite from Marsh which stated: "May I please have a single room. Tonya Leonard and I don't get along. We argue constantly. Signed, Rita Marsh." Morse entered Marsh's request in her room assignment system and advised Marsh that she was eleventh on the list for a single room in Lincoln Cottage and that four of her roommates were already on the list. Morse testified that she received approximately ten kites per week and that there was nothing unusual about Marsh's request. She also testified she heard nothing further from Marsh.

Marsh relies on the testimony of Sergeant Charlotte Balsinger, a correctional officer at Lincoln Cottage, who stated that, after one incident between Marsh and Leonard, she asked Morse to move Leonard to a single room. However, Balsinger's reason for that request was not due to a knowledge of specific threats of harm

against Marsh, but rather "because of the prior complaints from roommates about [Leonard's] manipulation and wanting to be in charge and just generally trying to make their life miserable...." According to Balsinger, Morse responded by indicating that "we don't reward troublesome inmates by giving them a single room." Morse retired from the ORW the same day of the incident.

As with defendants Amis and Arn, the evidence against Morse fails to create an issue of fact as to whether she had actual knowledge of a genuine risk of harm to Marsh. Neither the kite Marsh sent to Morse nor Balsinger's testimony indicates that Morse was informed of a risk of harm to Marsh. Nor may we infer, based on the record, that Morse had the requisite knowledge. We therefore hold that the district court properly granted JNOV for Morse.

### 4. Anthony Graves

 At the time of the incident, defendant Graves was the social worker assigned to Lincoln Cottage. Graves initially testified he only had authority to recommend, not make, room changes. Yet Morse testified, and Graves seemed to agree in his later testimony, that Graves could take disciplinary action against Leonard. Graves became aware of Marsh's problems with Leonard through a kite he received from Marsh and through communication with correctional officers at cottage meetings. Marsh testified that she met with Graves for the first time on December 9, 1985, and she requested a room change because Leonard was acting aggressively toward her, taking her belongings, and trying to "come on" to her. According to Marsh, Graves advised her to write a kite requesting a room change, and when she told him that she had already done so, Graves said he would look into it.

Approximately one week later, on December 17, 1985, Marsh and Leonard had an argument about a light being left on in the room with the result that Leonard scratched Marsh on the arm. Marsh reported the incident the next morning. Marsh again talked to Graves about her

problems with Leonard, specifically the "light bulb" incident, and told him that she was afraid because Leonard had threatened her for snitching to the correctional officers. Further, Sergeant Balsinger testified she told Graves that Leonard should be placed in a single room and that Marsh felt threatened by Leonard. Graves admitted Marsh told him the problems with Leonard were of such a nature that there could be a fight in the room.

Because of the complaints against Leonard, later in the day on December 17, 1985, Graves had Marsh, Leonard and their two roommates come to his office to discuss the "light bulb" incident. He testified that "one of the ways we use to determine whether [inmates] are telling the truth is we have to confront them with the person they are accusing...." In the office, Leonard told Graves that she had accidentally scratched Marsh, that they had just been playing around and that they were friends again. The other roommates denied knowledge of the incident, and Marsh agreed with Leonard's version of the incident.

Graves sent Leonard and the other roommates out of his office and talked to Marsh alone to find out why she changed her story. At the trial, Marsh testified that during their meeting Leonard stood behind Graves and made threatening gestures toward her, causing her to retract her allegations. Graves admitted that Marsh told him Leonard had been making faces behind his back during the meeting. Graves, however, testified that "if [Marsh] was in fear of her life or whatever, she would have stuck to what she said ... [and] when she didn't do that, she was basically tying my hands from taking any kind of disciplinary action against this other woman."

When the evidence is viewed in the light most favorable to Marsh, it is still insufficient to create a question of fact as to whether Graves acted with deliberate indifference to a risk of harm to Marsh. Where no other correctional officer had observed the "light bulb" incident and where Leonard denied that the scratch on Marsh's arm had been intentional, in order to gain

knowledge of a genuine risk of harm to plaintiff, Graves needed more evidence than the complaint of another inmate, especially an inmate who recanted her story when confronted by the accused. The district court, however, correctly found that

> Graves was not aware of the escalation of tension between plaintiff and Leonard that occurred after the time of the meeting regarding the light bulb incident on December 17, 1985. There is no evidence that Graves had knowledge of Leonard's threat of sexual attack made on December 18th, the verbal fight that occurred between Leonard and the plaintiff in the shower on the 19th and of Leonard's threat to kill plaintiff, made on the 19th.

As is the case with Amis, Arn and Morse, because the evidence does not support a reasonable inference that Graves had knowledge (either actual or inferred) of a genuine risk that plaintiff was going to be seriously injured, we need not address the second issue under the "deliberate indifference" standard of liability, i.e. whether, in the words of the district court, Graves consciously refused to take steps to protect Marsh. We affirm the district court's grant of JNOV for defendant Graves.

5. Delores Furrow

As an employee of ORW, defendant Furrow held the rank of lieutenant. On the evening prior to the incident, Furrow was the shift supervisor for the 2:30 p.m. to 10:30 p.m. shift. As a shift supervisor, she had authority to place inmates in the institution's hospital on a temporary basis.

Plaintiff testified that she had advised Furrow about Leonard's theft of her commissary and the fact that Leonard was picking on her and aggravating her. Marsh also told Furrow on December 18th that Leonard had threatened to sexually assault her. Furrow responded to Marsh's concerns by placing her in ORW's infirmary for the night. Furrow testified she did not believe Marsh was seriously threatened; rather, she removed plaintiff from the room so that the other inmates could get some rest.

The next day, December 19th, Leonard threatened to kill Marsh after they got into an argument. A correctional officer, Sharon Foos, went to the dorm to break up the argument. After Foos informed Furrow about the incident, Furrow told Foos to send Marsh and Leonard over to her office. In Leonard's presence, Marsh told Furrow that Leonard had threatened to kill her that night because she talked to the prison officials too much. Leonard, however, told Furrow she had only been kidding. Unlike the meeting with defendant Graves, Marsh stuck to her allegations. Marsh also testified at trial that she told Furrow she wanted to get out of the room, hoping Furrow would place her in the infirmary overnight as she had done the previous night. Furrow instead sent the women back to their dorm.

However, sometime on December 19th Furrow prepared a staff report to ORW's Deputy Superintendent, requesting that Leonard be moved to a single room. Stapled to the staff report were two documents. First, an unsigned note was attached which read: "Miss Balsinger, would you please keep and [sic] i [sic] on 209 tonight, there could be some trouble in there tonight...." The other attached document was a two-page description of the light bulb incident between Marsh and Leonard. In that document, plaintiff complains that Leonard tried to "run the room" and wanted to "eat up new inmates [sic] commissary."

At trial, Furrow testified she was not aware that Leonard had scratched Marsh's arm on December 16th. She could not recall any instances in which Leonard had hurt anyone and did not feel Leonard posed a threat of serious harm to plaintiff. Furrow also believed that on December 19th she had advised the next shift supervisor, Sergeant Callahan, of the problems between Marsh and Leonard. Callahan did not recall this occurrence.

█ Defendant Furrow cross appeals the district court's denial of qualified immunity, JNOV and a new trial. As demonstrated by the foregoing fact summary, Furrow's knowledge of the problems between Marsh and Leonard is more extensive than

that of the other defendants. Moreover, she allegedly had the authority to place Marsh in the hospital the night of the incident but did not do it. Thus, the evidence with regard to whether her conduct violated the eighth amendment is closer. Nevertheless, insofar as Furrow's assertion of qualified immunity, that affirmative defense "is a purely legal question," *Garvie v. Jackson,* 845 F.2d 647, 649 (6th Cir.1988), so we review the district court's denial of qualified immunity de novo. *See, e.g., Tribble v. Gardner,* 860 F.2d 321, 323 (9th Cir.1988).

The scope of qualified immunity is well stated by the Supreme Court in *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982): "[G]overnment officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* at 818, 102 S.Ct. at 2738. Qualified immunity is based on the principle that "an official could not reasonably be expected to anticipate subsequent legal developments, nor could he fairly be said to 'know' that the law forbade conduct not previously identified as unlawful." *Id.*

■ As *Harlow* makes clear, an objective test governs the qualified immunity defense, which is applicable only to government officials. *See also Davis v. Scherer,* 468 U.S. 183, 191, 104 S.Ct. 3012, 3017, 82 L.Ed.2d 139 (1984) ("*Harlow v. Fitzgerald* ... rejected the inquiry into state of mind in favor of a wholly objective standard.... Whether an official may prevail in his qualified immunity defense depends upon the 'objective reasonableness of [his] conduct as measured by reference to clearly established law.' "); *Ohio Civil Service Employees Ass'n v. Seiter,* 858 F.2d 1171, 1173 (6th Cir.1988). It was stipulated and agreed that defendants in this case were acting under color of state law.

Further, for purposes of qualified immunity, the relevant state of the law is that which is in existence at the time of the alleged statutory or constitutional violation. *Davis,* 468 U.S. at 194, 104 S.Ct. at 3019 (An official will "not be liable in damages under § 1983 unless *the constitutional right that he was alleged to have violated* was 'clearly established' at the time of the violation.") (citation omitted) (emphasis in original), *Poe v. Haydon,* 853 F.2d 418, 425 (6th Cir.1988). The alleged attack occurred on December 20, 1985. Accordingly, the question in our case is whether at that time a reasonable person in defendant Furrow's position would have known that a prison inmate had a clearly established constitutional right to be free from Leonard's conduct.

Initially, we disagree with defendants' argument that our circuit's decision in *McGhee v. Foltz,* 852 F.2d 876 (6th Cir. 1988), indicates that the standard of liability was not clearly established as of December 1985. In *McGhee,* we modified the standard of liability from one of gross negligence *or* deliberate indifference, as set out in 1982 in *Stewart v. Love,* 696 F.2d 43 (6th Cir.1982), to simply one of deliberate indifference. We agree with the district court that while "the standard of liability may have become narrower, [that fact] does not preclude a finding that defendants were on notice in 1985 that a higher degree of culpability, namely, deliberate indifference, was actionable." [6]

However, Marsh may not rely solely on the fact that *Stewart* and other pre–1986 circuit decisions established "deliberate indifference" as the standard of liability for proof that there was a clearly established eighth amendment right which was violated. As Judge Graham recognized, "deliberate indifference" is not easily defined:

In preparing jury instructions in this case, this Court had some difficulty explaining the concept of deliberate indifference. Part of the difficulty lies in the fact that there is a degree of inherent conflict between the two words chosen to express the standard. Deliberate refers to action 'characterized by or resulting from slow, careful, thorough calculation

---

**6.** Defendants' point, nevertheless, indicates how recently this area of law has developed.

and consideration of effects and consequences.' Webster's Third New International Dictionary 596 (3d ed. 1981). Indifferent, on the other hand, means to be 'marked by a total or nearly total lack of interest in or concern about something.' Its synonyms include 'unconcerned, aloof, detached, uninterested.' [*Id.* at 1151]. Using these two words together is in nearly the same category as mixing the concepts of willfulness and lack of due care, such as would occur if one were to coin the phrase 'intentionally negligent.'

*See also Howell v. Evans*, 922 F.2d 712 (11th Cir.1991) (distinction between deliberate indifference and negligence is conceptually vague because 'indifference' generally implies a lack of attention by the actor similar to what is referred to as negligence, whereas 'deliberate' requires that the actor recklessly ignore the situation despite information a reasonable person would know requires action); *Redmond*, 475 F.Supp. at 1117 ("The difficulty arises in formulating a concrete definition of the cryptic phrase, 'deliberate indifference.' ").

■■■ We recognize that there is no definitive guide as to when a right is "clearly established." *Zweibon v. Mitchell*, 720 F.2d 162, 168–69 (D.C.Cir.1983). "The right in question, however, cannot be simply a generalized right, like the right to due process." *Danese v. Asman*, 875 F.2d 1239, 1242 (6th Cir.1989) (citing *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987)). *See also Garvie*, 845 F.2d at 650–52. The Supreme Court, concerned that the artful pleader could convert the rule of qualified immunity into a rule of virtually unqualified liability by alleging a violation of extremely abstract rights, recently stressed that the right allegedly violated must have been clearly established in a more *particularized* sense. *Anderson*, 483 U.S. at 640, 107 S.Ct. at 3039. "The contours of the

right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* Simply put, while official action is not necessarily protected by qualified immunity unless and until the very action in question has been held unlawful, *id.*, the unlawfulness must be apparent in light of pre-existing law. *Malley v. Briggs*, 475 U.S. 335, 344–45, 106 S.Ct. 1092, 1097–98, 89 L.Ed.2d 271 (1986).

■■■ At issue here is whether the right to be free from cruel and unusual punishment is violated where prison officials fail to segregate an inmate who has received death threats, threats of assault and arguments with another inmate in the same room. *Cf. Danese*, 875 F.2d at 1243–44. As of 1985, this court had decided only one case dealing with eighth amendment liability for failure to protect an inmate from assault by another inmate. In *Stewart v. Love*, 696 F.2d 43 (6th Cir.1982), an inmate, fearing for his own safety due to rumored threats of harm against him, requested and received a temporary transfer, and upon return to his original unit, informed prison administration of renewed threats, but was beaten so severely as to require hospitalization. Nonetheless, this court found mere negligence.[7]

As in *Stewart*, Marsh requested segregation because of threats from another inmate. Granted, in our case Marsh provided defendants with more than just the "rumored" threats present in *Stewart*. For example, Leonard actually admitted to Furrow that she had threatened to kill Marsh, then stated that she had only been kidding. From *Stewart*, however, we only learn what does *not* constitute deliberate indifference. That case, therefore, provides no significant help as to whether Furrow was indeed deliberately indifferent. In other words, while a cause of action for failure to protect an inmate from attack by another inmate under a deliberate indifference stan-

---

7. The facts in *Stewart* parallel those in *Davidson v. Cannon*, 474 U.S. 344, 106 S.Ct. 668, 88 L.Ed.2d 677 (1986), in which the plaintiff specifically identified the assailant prior to the attack, yet the Supreme Court found insufficient negligence to support an award of damages under the due process clause. The petitioner in *Davidson* did not challenge the district court's conclusion that there was no eighth amendment violation because the defendants had not acted with deliberate or callous indifference to his needs.

dard of liability was established as of December 1985, see Walker v. Norris, 917 F.2d 1449, 1453 & n. 7 (6th Cir.1990), we find that the right of an inmate to be segregated due to the threats of a roommate had yet to be sufficiently defined in this circuit to be considered "clearly established."

 In the absence of controlling precedent,[8] decisions from other circuits "must both point unmistakably to the unconstitutionality of the conduct complained of and be so clearly foreshadowed by applicable direct authority as to leave no doubt in the mind of a reasonable officer that his conduct, if challenged on constitutional grounds, would be found wanting." Seiter, 858 F.2d at 1177. We should initially point out that cases from other courts concerning eighth amendment liability prior to 1986 for failure to segregate in the face of a pervasive risk of harm [9] are not too helpful here, as we have already noted that there was no evidence of frequent violence at the ORW.

One decision from the Eighth Circuit, however, has found that liability could be imposed in circumstances where a young inmate, previously segregated from the general population because of susceptibility to physical abuse, was then placed in a cell with two other inmates, one of which was sent there because of prior fighting by a prison official who knew that another prisoner had been beaten to death in the plaintiff's new cell during his shift only weeks before. See Wade v. Haynes, 663 F.2d 778, 780–82 (8th Cir.1981). While there were no requests for help, Wade nonetheless held that deliberate indifference could be inferred from evidence of the plaintiff's susceptibility to assault and the corresponding lack of due care toward him. In addition, there are cases where eighth amendment liability has been found because a prison

official "refused" to investigate a prisoner's cries for help or "intentionally" exposed a prisoner to violence. See, e.g., Matzker v. Herr, 748 F.2d 1142, 1149–50 (7th Cir.1984).

 While pre–1986 opinions of other circuits help complete our analysis, they do not convince us that the denial of qualified immunity was appropriate in Furrow's circumstances. Unlike Matzker, supra, there was no evidence here of intent to injure Marsh or complete indifference on Furrow's part. Furrow's acts were certainly "deliberate." On the night in question, she made a decision to send plaintiff back to her room. However, it seems to us that to find "indifference" we would have to conclude that Furrow did not care whether Marsh was assaulted or not. Although she did not believe the threats were serious, Furrow 1) removed Marsh from the room on the 18th of December, the night before the assault; 2) talked to the two women in her office on the 19th; and 3) filled out a staff report on the incident. Her conduct refutes any theory that she had animosity toward plaintiff or, as the district court put it, that she was unconcerned or aloof and thus consciously refused to take steps to protect Marsh from injury. Cf. Stewart, 696 F.2d at 45 (appendix) ("Had no action whatsoever been taken to protect the plaintiff, the court would be inclined to allow this action to proceed to a full hearing."), Branchcomb v. Brewer, 683 F.2d 251 (8th Cir.1982). Because on the night in question Leonard admitted she made the death threat but then denied she meant it, and because the evidence showed that such threats were made "all the time" by inmates, there was no basis for a juror to conclude Furrow was not telling the truth when she testified she did not believe the threat was serious enough to warrant further action.[10] Also, unlike the plaintiff in

---

**8.** Marsh admits in her brief that "the Supreme Court has not specifically addressed the standard of liability for conditions of confinement, which is the case here."

**9.** See, e.g., Martin, 742 F.2d at 474–75; Stokes v. Delcambre, 710 F.2d 1120, 1124–25 (5th Cir. 1983); Murphy v. United States, 653 F.2d 637, 644–45 (D.C.Cir.1981); Withers v. Levine, 615

F.2d 158, 161 (4th Cir.1980); Little v. Walker, 552 F.2d 193, 194–95 (7th Cir.1977); Williams v. Vincent, 508 F.2d 541, 546 (2d Cir.1974); Woodhous v. Virginia, 487 F.2d 889 (4th Cir.1973).

**10.** In measuring whether inaction constitutes a conscious disregard of an inmate's safety, courts have looked at the history of incidents involving

*Wade, supra,* there was no evidence that Marsh was especially susceptible to Leonard's aggressiveness.

Moreover, as previously suggested, when there is no controlling precedent in the Sixth Circuit our court places little or no value on the opinions of other circuits in determining whether a right is clearly established. *See Seiter,* 858 F.2d at 1176 ("In an extraordinary case, it may be possible for the decisions of other courts to clearly establish a principle of law."); *Garvie,* 845 F.2d at 649 ("We should focus on whether, at the time defendants acted, the rights asserted were clearly established by decisions of the Supreme Court or the courts of this federal circuit."). In sum, we do not believe that "there was such a clear trend in the caselaw that we can say with fair assurance that the recognition of the right by a controlling precedent [i]s merely a question of time." *Cleveland–Perdue v. Brutsche,* 881 F.2d 427, 431 (7th Cir.1989).

We conclude that a reasonable person in 1985, and perhaps even today, would have had trouble determining whether Furrow's conduct violated the eighth amendment. We do not wish to second guess the judgment of a prison official who has not been "indifferent" as that term has been applied in other similar cases. Clearly, in hindsight Furrow made an error of judgment. Prison officials, however, should not be subject to personal liability for "misjudging" the seriousness of inmates' threats, especially where idle threats are a common occurrence. *See, e.g., Daniels v. Williams,* 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986) (negligence, notwithstanding injury, does not state a claim for which relief can be granted under 42 U.S.C. § 1983); *Stewart,* 696 F.2d at 44 (negligence for failure to protect from assault by other inmates is not actionable under eighth amendment). We find that defendant Furrow was entitled to qualified immunity and therefore JNOV. Accordingly, we do not address the issue of whether she should be granted a new trial.

### III.

We recognize that our finding that Furrow is entitled to qualified immunity might itself be seen as a form of judicial deliberate indifference. Therefore, it is necessary to further explain the basis for the application of that principle in the context of the facts of this case, especially since the Sixth Circuit has not had the opportunity to provide much guidance where liability is sought based upon conditions of confinement.

As we should be, we are acutely aware that a jury, under instructions which are not challenged *per se,* found in favor of Marsh and against five of the nine prison officials named in the complaint as defendants. Thus we may fairly assume that the jury listened attentively to the evidence in light of the instructions and made a careful discrimination between those whose conduct fell short of the standard and those whose conduct was compliant with it. As we have earlier commented, it is difficult to fault that decision if a rule of hindsight was to be followed or if general notions of equity and sympathy are to be given full play. The law has recognized, and is continuing to recognize, that responsibility for the protection of prisoners must in the final analysis rest upon prison administration. Equally evident is that the circumstances of most anti-social and criminally violent individuals in prison are such that they will rarely, if ever, have the means to be held financially responsible in damages to the party they injured, and that without some other remedy that party may very well remain unrecompensed.

Nonetheless, qualified immunity is designed to strike an appropriate balance between the deference that should be accorded to prison officials in their administration of the prison and the constitutional right of

---

threats which were then *actually carried out,* and/or whether prior requests for protection were made but went unheeded. *See, e.g., Goka,* 862 F.2d at 652; *Jones v. Morris,* 777 F.2d 1277, 1280 n. 5 (7th Cir.1985). Furrow was apparently unaware that Leonard had scratched Marsh on December 16th, 1985. Also, requests for help in Marsh's case did not go unheeded; rather, Furrow failed to completely satisfy them after her investigation.

prisoners to be free from cruel and unusual punishment. *Harlow,* 457 U.S. at 816–17, 102 S.Ct. at 2737 (citation omitted). That balance, as further explained below, would be upset here were we to find Furrow, or for that matter any of the other defendants, liable.

It does not take much inquiry into the substantial research on this subject to convince the reader that historically prisons are places of danger for prisoners and employees alike, and that a large percentage of all inmates have some history of aberrant behavior and violent conduct or they would not be there. "Indeed, some violence in prisons has been found to be unavoidable due to the character of the prisoners." *Williams,* 853 F.2d at 589.

While suing prison officials personally may often provide the only effective remedy for a victim of inmate brutality which allegedly would not have happened but for the lack of proper supervision, the financial impact upon such officials of even a successful defense could be enough to bankrupt those officials no matter what the degree of culpability. Thus in this case, aside from substantial litigation costs, a total of $45,000 in compensatory damages and $5,000 in punitive damages was awarded against each of the five defendants who were by no means bringing in substantial income at the time of the incident. When viewed in the light of the real threat which such potential liability imposes on one who seeks entry into the very dangerous business of prison administration, it becomes apparent that the attractiveness of such employment to persons who are truly qualified and financially and morally responsible is severely and adversely impacted. Of course, prison officials may be able to obtain reimbursement or other recourse to protect themselves. Yet, the threat of litigation alone may be enough of a deterrent to enter into such employment.

Therefore, unless a fairly high threshold of liability for injuries inflicted by the wrongful act of third parties is imposed, the already beleaguered correctional systems of the states and other governmental units will further deteriorate, for experience and common sense will quickly telegraph the word to the wise that such employment is to be avoided. This cold reality forms at least one of the reasons why, in our view, the Supreme Court has created the doctrine of qualified immunity and thus seemingly placed a roadblock to what others might conceive as an effective remedy to compensate the injured prisoner. By making this issue a question of law, *see Garvie, supra,* the Supreme Court has recognized that courts are more proficient at balancing the conflicting policies inherent in a case such as ours.

To be sure, there are no easy solutions to prison violence. The resources of the state are not always adequate and probably never will be to guarantee that each individual prisoner may, like Napoleon, be isolated from all others and supervised in that manner. Indeed, courts frequently hold that such conduct without good reason may itself be violative of that same prisoner's right to be free from cruel and unusual punishment. Classically, the circumstances of this case reflect that dilemma all too well in that the facilities at the ORW were insufficient to provide individual rooms for each prisoner. Therefore, to some ORW prisoners it may have appeared that the only way to obtain a highly desired single room was to make one's behavior so antisocial as to force prison officials to satisfy their requests. Certainly, when defendant Furrow's authority is viewed in light of the realities of prison life, the temporary expedient of confining a threatened prisoner to the prison infirmary can hardly be described as anything but the most tentative and unsatisfactory solution, for an infirmary certainly is not a detention tank or a protective custody place, but rather a facility for medical treatment. To have held in such a case that an individual who has not been unconcerned or aloof must nevertheless respond in damages of $45,000 compensatory and $5,000 punitive for failing to place, for the second time, a prisoner who was otherwise healthy but perceived in danger in an infirmary overnight is in our judgment unreasonable and wholly unfair to the person so held.

As alluded to earlier, the judiciary maintains the responsibility to set a standard of qualified immunity with a threshold sufficiently high to represent a proper recognition of the public interest in obtaining and retaining reliable and responsible prison personnel. Beyond that principle it is difficult for us to set forth any precise limits, for the variety of circumstances in which such constitutional violations may occur is infinite. We are left then with the conclusion that notwithstanding the injuries which were unquestionably suffered by Marsh, no individual in the shoes of a defendant named here could reasonable have known at the time it happened that the particular acts and omissions attributed to him or her was such that, under the clearly established law at the time, it violated plaintiff's right under the eighth amendment to be free from cruel and unusual punishment.

In so holding, we recognize that the doctrine of qualified immunity extends its protection only to individuals and not to state or for that matter local government. Where the governmental unit is the state, sovereign immunity may apply to bar any potential suit, but certainly in many states recourse is available under state law especially where immunity has been waived through the establishment of specialized state courts to whom such claims may be submitted by injured prisoners. Further, although not involved here, the doctrine of qualified immunity is no defense to municipal corporations which may otherwise be liable for federal constitutional violations under the Civil Rights Act. Finally and beyond that, the doctrine does not bar private causes of action under state law against the direct perpetrator of the injury or indeed against any individual defendant to the extent that state or common law provides some remedy in state courts.

## IV.

For the foregoing reasons we AFFIRM the grant of JNOV as to defendants Amis, Arn, Morse and Graves, and VACATE the order denying JNOV as to defendant Furrow and REMAND the case to the district court for entry of JNOV as to defendant Furrow.

KENNEDY, Circuit Judge, concurring separately.

I agree with Judge Engel that it was not clearly established in December 1985 that a prison administrator violated a prisoner's right to be free from cruel and unusual punishment by failing to remove the prisoner from a dormitory room when she had been threatened by a single inmate. However, I would not reach that issue because I do not believe that the evidence would permit the jury to find anything more than an error of judgment. Such an error of judgment made in good faith, and here there is no evidence of bad faith or anything but good faith, does not amount to cruel and unusual punishment. *Whitley v. Albers,* 475 U.S. 312, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986) explains:

> It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause, whether that conduct occurs in connection with establishing conditions of confinement, supplying medical needs, or restoring official control over a tumultuous cellblock....
>
> ....
>
> When the "ever-present potential for violent confrontation and conflagration," *Jones v. North Carolina Prisoners' Labor Union, Inc.,* 433 U.S. 119, 132, [97 S.Ct. 2532, 2541, 53 L.Ed.2d 629] (1977), ripens into *actual* unrest and conflict, the admonition that "a prison's internal security is peculiarly a matter normally left to the discretion of prison administrators," *Rhodes v. Chapman,* [452 U.S. 337, 349 n. 14, 101 S.Ct. 2392, n. 14, 69 L.Ed.2d 59 (1981)], carries special weight. "Prison administrators ... should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish,* [441 U.S. 520, 547, 99 S.Ct. 1861, 1878, 60

L.Ed.2d 447 (1979)]. That deference extends to a prison security measure taken in response to an actual confrontation with riotous inmates, just as it does to prophylactic or preventive measures intended to reduce the incidence of these or any other breaches of prison discipline. It does not insulate from review actions taken in bad faith and for no legitimate purpose, but it requires that neither judge nor jury freely substitute their judgment for that of officials who have made a considered choice. Accordingly, in ruling on a motion for a directed verdict in a case such as this, courts must determine whether the evidence goes beyond a mere dispute over the reasonableness of a particular use of force or the existence of arguably superior alternatives.

*Id.* at 319, 321–22, 106 S.Ct. at 1084, 1085 (emphasis in original).

Viewed in the light most favorable to plaintiff, the evidence here shows only that Furrow made a considered judgment that Leonard's threat was not serious and that talking to the two women was sufficient. She didn't ignore the incident. When Leonard told her that she had not meant the threat and where the evidence showed that threats by inmates to kill other inmates were made all the time when they weren't really meant, we have only a dispute as to whether she exercised due care in making that judgment. That she misjudged the seriousness of the threat may be negligence, but it is not deliberate indifference. Further evidence that she was not deliberately indifferent is found in the fact that she directed that special attention be given to checking plaintiff's dormitory room. There is simply no basis for finding that she did not act in good faith.

MILBURN, Circuit Judge, concurring in part and dissenting in part.

I concur in parts I and II–1 to 4 of the majority's opinion affirming the grant of JNOV for defendants Amis, Arn, Morse and Graves. However, I respectfully dissent from parts II–5 and III in which the majority holds that defendant Furrow was entitled to qualified immunity and therefore JNOV.

In my view, Furrow was not entitled to qualified immunity because the Eighth Amendment's protection against attack from another inmate was clearly established in this circuit on the date Leonard attacked Marsh. *See Walker v. Norris,* 917 F.2d 1449, 1453 n. 7 (6th Cir.1990); *Stewart v. Love,* 696 F.2d 43, 44 (6th Cir. 1982) (per curiam). Moreover, the right was sufficiently "particularized" because after *Stewart* a reasonable official would understand that deliberate indifference to a risk of injury to an inmate from an assault by another inmate would give rise to liability under the Eighth Amendment. *See Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987) (The Supreme Court indicated that requiring a right to be more particularized "is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful."). Therefore, it was for the jury to decide whether the defendants acted with deliberate indifference. *See Torraco v. Maloney,* 923 F.2d 231, 234 (1st Cir.1991).

In this case, the jury found that Furrow violated Marsh's Eighth Amendment rights by failing to protect her from Leonard's attack. When viewed in the light most favorable to Marsh, the evidence creates a question of fact as to whether Furrow acted with deliberate indifference to a known risk of injury to Marsh. Because reasonable minds could disagree as to whether Furrow acted with deliberate indifference by not removing Marsh from the room she shared with Leonard, I would affirm the district court's denial of Furrow's motion for JNOV. Moreover, because the jury's verdict against Furrow is one which could reasonably have been reached, I would also hold that the district court did not abuse its discretion by denying Furrow's motion for a new trial.