Israel E. NELSON, Plaintiff–Appellee,

v.

Roger T. OVERBERG, Defendant–
Appellant.

No. 92–3599.

United States Court of Appeals,
Sixth Circuit.

Argued May 4, 1993.

Decided July 20, 1993.

Christopher Jones, Thompson, Hine & Flory, Columbus, OH (argued and briefed), for plaintiff-appellee.

Gary D. Andorka, Office of Atty. Gen., Columbus, OH (argued and briefed), for defendant-appellant.

Before: MILBURN, RYAN, and NORRIS, Circuit Judges.

RYAN, Circuit Judge.

The defendant, Roger T. Overberg, Chief of Classification for the Ohio Department of Rehabilitation and Corrections, alleges that the district court erred in denying his motion for summary judgment based on qualified immunity in this prisoner civil rights case. We conclude that the district court correctly decided that the law in this area is clearly established, and that a reasonable official in Overberg's place would have known that his actions violated the law. We therefore affirm.

## I.

After being convicted of felonious assault in July 1989, Israel Nelson was sent to the Ohio Correctional Reception Center, where he participated in an orientation program for Ohio prison inmates. While there, he was informed that he had been assigned to Orient Correctional Institute (OCI), a medium-security prison with psychiatric coverage. He entered OCI on August 1, 1989.

On August 12, 1989, Nelson was telephoned by Lisa Haynes, his common-law wife and also the victim of the assault for which he had been convicted. Haynes told Nelson that he had enemies at OCI; specifically, two inmates who were friends of her brother, a major cocaine dealer known as "Eightball" Haynes, were plotting an attack. Nelson next received a threatening letter, that reads as follows:

> They can take you, "But" I'm the one who will break you. The "Ball" roll's [sic] all over ... Sincerly [sic] Your Nightmaire [sic]

(Ellipsis in original.) Nelson assumed that the letter was from Eightball Haynes.

Fearing for his safety, Nelson sent two written communications to Overberg, both of which arrived about the same time in mid-August. The first letter reads as follows:

> I would like to inform you that I was pleased with the placement of choice that I've been assigned to.
>
> However I've been notified of lots of enimies [sic] thats [sic] residing in this particular institution, and feels [sic] that it's bound to be conflicts with these type of individuals, which I'm positive there will be trouble for me there, which I don't need. It would be greatly appreciated if you would reconsider my institutional assignment, for my welfare and others.
>
> For myself, I would recommend Allen but I'd suppose that's up to you to decide.
>
> However, it would be greatly appreciated if the reconsideration of this recommendation is successful.

The second letter is similar:

> I am writing to inform you that while being here at CRC I have been notified that I have enimies [sic] at the institution that I have been placed and also have received an [sic] threat letter also.
>
> However I would have to admit that while being here at CRC I have been flowing smoothly and easily with the system. Therefore by recieving [sic] this information and knowing that I have enimies [sic] at Orient it would be greatly appreciated if you would reconsider my institutional placement so I will avoid hurting or being hurt by someone else.
>
> I would like to avoid trouble as much as possible and stay out of trouble so my time

will go by quickly and easily. The reccommendation [sic] of this reconsideration will be greatly appreciated if your accommodation is successful.

Specificly [sic] Allen or Ross.

Overberg's sole response to Nelson's two communications was to send Nelson a form letter identifying six precommitment variables that are initially taken into account when classifying an inmate for an institutional assignment. The letter in no way addressed Nelson's safety concerns, even though Overberg does have a standard form letter specifically designed for this purpose. That form letter directs inmates who fear for their personal safety to contact appropriate officials at their institution or to request protective custody, and also advises them to provide more detailed information regarding the source of their fears. Overberg conducted no independent investigation of the basis for Nelson's concerns, although he did review administrative information on file for Nelson. Overberg asserts that, based on the lack of specificity in Nelson's letter and the lack of corroborating information in the administrative file, he concluded that Nelson was fabricating the threats.

Unfortunately for Nelson, this was not the case. He was severely beaten by two assailants on October 1, 1989. He spent five days in the hospital as a result of the injuries he received. He then brought suit under 42 U.S.C. § 1983 against Overberg, alleging that Overberg violated his Eighth Amendment right to be free from cruel and unusual punishment when Overberg reaffirmed his placement at OCI after Nelson informed Overberg that he had enemies there.

Overberg moved for summary judgment on the basis of qualified immunity and the district court denied the motion. It reasoned that Nelson had a clearly established right under the Eighth Amendment to be free from a prison official's deliberate indifference to his well-being, and that Overberg therefore had some responsibility to investigate the allegations of threats by other inmates. The court concluded:

The question of whether a particular constitutional right is clearly established is, of course, purely a legal [inquiry]. Whether a reasonable prison official should have been aware that such a right is implicated by a particular set of facts can depend on what factual conclusions are drawn from the evidence. The inferences that can be drawn at this stage of the case are enough to permit a jury to find that Overberg knew of a threat, could have, with little difficulty, either investigated or sent a letter advising Nelson how to deal with the threat, but instead disregarded the threat completely, leading to Nelson's injuries.... [N]o qualified immunity is available under that set of facts.

Overberg filed this timely appeal.

## II.

A denial of summary judgment on the basis of qualified immunity is appealable. *Mitchell v. Forsyth*, 472 U.S. 511, 530, 105 S.Ct. 2806, 2817, 86 L.Ed.2d 411 (1985); *Long v. Norris*, 929 F.2d 1111, 1113–14 (6th Cir.), *cert. denied*, ——— U.S. ———, 112 S.Ct. 187, 116 L.Ed.2d 148 (1991). The issue of qualified immunity presents a question of law for the district court; thus, on appeal, this court considers the issue de novo. *Hall v. Shipley*, 932 F.2d 1147, 1150 (6th Cir.1991). Summary judgment is only appropriate if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Roland v. Johnson*, 856 F.2d 764, 769 (6th Cir.1988). In considering a motion for summary judgment, the court must view all facts and inferences in the light most favorable to the nonmoving party. *Id.*

## III.

Overberg argues that he did not violate any clearly established constitutional right of Nelson by failing to take action after receipt of Nelson's vague letters. He argues that he based his decision on professional judgment and experience, and that he is therefore entitled to qualified immunity.[1]

1. In his reply brief, Overberg points to allegedly inaccurate statements of fact in Nelson's brief.

However, each of Nelson's statements of fact has some evidentiary basis, albeit often only Nelson's

■ Before Overberg can be granted qualified immunity, the court must decide: 1) whether Nelson has identified a clearly established right alleged to have been violated; and 2) whether Overberg reasonably should have known that the conduct at issue was undertaken in violation of that right. *See Johnson v. Estate of Laccheo*, 935 F.2d 109, 111 (6th Cir.1991).

■ The legal standard applicable to determining whether a violation of the Eighth Amendment occurred in the context of an assault upon an inmate is whether the defendant's conduct amounted to a "deliberate indifference" to a risk of injury to the plaintiff. *See Whitley v. Albers,* 475 U.S. 312, 318, 106 S.Ct. 1078, 1083, 89 L.Ed.2d 251 (1986); *Estelle v. Gamble*, 429 U.S. 97, 104, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976). The Supreme Court in *Whitley* concluded that in order to support an action under section 1983, plaintiffs must establish something more than a lack of ordinary due care, inadvertence, or error; the conduct must instead be "obdurate" or "wanton"—exhibiting recklessness or callous neglect. *Whitley*, 475 U.S. at 318, 106 S.Ct. at 1083. This standard strikes a balance between the deference to be accorded to prison officials in their administration of the prison and the constitutional right of prisoners to be free from cruel and unusual punishment. *Id.*

■ We believe that resolution of this case is governed by our decision in *Roland*, 856 F.2d 764. In *Roland,* this court reversed a grant of summary judgment in favor of a defendant on the basis of qualified immunity. Roland's suit under 42 U.S.C. § 1983 alleged that, in 1983, he had been raped by one inmate while another inmate served as a lookout, and that the defendants violated his Eighth Amendment rights by failing to provide him with adequate safety and protection and by allowing conditions to exist at the prison which resulted in his rape. In language very similar to that employed by the district court in this case, this court reasoned as follows:

Roland has assembled a substantial record establishing a legitimate factual question as to whether the defendants were deliberately indifferent to his safety. This is especially true since all factual inferences are to be resolved in his favor on a motion for summary judgment. Consequently, when viewing the evidence in a light most favorable to the plaintiff, as we must do, we conclude that it is possible that a jury *could have found* liability as to each of the defendants....

*Id.* at 769–70. The *Roland* court specifically considered the case of a defendant, Toland, who, like Overberg here, was Chief of Classification. The plaintiff in *Roland* presented facts demonstrating that Toland had been asked by the prison's Unit Manager to reclassify the two men who assaulted Roland, "because of investigative reports linking them to an ongoing homosexual pressure gang ... and because of hearsay evidence that [they] were pressing other inmates in the block for sex." *Id.* at 766 (emphasis omitted). Toland argued that the record did not support the plaintiff's contention that Toland knew that the two inmates were actively pressing other inmates for sex, and also argued that "he did not reclassify [the two inmates] because there was no written documentation or disciplinary finding regarding their alleged behavior." *Id.* The court, however, rejected his arguments:

[A] jury could find that he had been informed of the threat [the two inmates] posed to other inmates, but failed to take action to reclassify these inmates ... when asked to do so by [the] Assistant Resident Unit Manager [ ]. A jury could also find that if Toland had conducted further investigations after his discussions with [the Assistant Resident Unit Manager], he would have found widespread evidence that [the two inmates] were pressing other inmates for sex.

*Id.* at 770. The court concluded that

[i]n light of the above observations, there clearly exist questions of material fact con-

---

testimony. Given that this court must view the facts in the light most favorable to Nelson, Over-

berg's contentions are without merit.

cerning the behavior of each of the defendants with respect to the injuries allegedly suffered by the plaintiff, and whether that behavior under the circumstances of this case amounts to a deliberate indifference to the plaintiff's safety. Accordingly, a summary judgment order was not appropriate in this case.

*Id.*

*Roland* makes plain that, at the time Nelson was assaulted, he had a clearly established right to be free from attack by other prisoners, and that Overberg, as a prison official, had an obligation to take reasonable steps to protect Nelson from violence at the hands of other inmates. *Roland* established the Eighth Amendment rights of prisoners with sufficient particularity that, by 1989, there could have been no reasonable doubt that such a right existed.

■ This conclusion answers only the first part of the qualified immunity inquiry, however. The second half of the inquiry requires the court to answer the question whether a reasonable prison official would have been aware, based on Nelson's letters, that violence was imminent. Or, put another way, whether a reasonable prison official would have understood that Nelson's letters implicated the necessity of protecting the Eighth Amendment right established in *Roland*. This framing of the question is different than that suggested by Overberg, who asks us to focus on what conduct he actually performed rather than what conduct was required. He argues that the issue is not whether a reasonable prison official should have been aware that disregarding Nelson's letter would have violated his Eighth Amendment rights, but whether Overberg reasonably *could have* believed that his decision to affirm Nelson's classification at OCI despite Nelson's unsubstantiated allegations of threats was consistent with 1989 law of prisoners' Eighth Amendment rights to be protected from assault. Having wrestled with the different ways of framing the question, we conclude that it really makes no difference how one frames it—either way, Nelson's letters would have alerted a reasonable prison official that more action needed to be taken than was taken by Overberg to protect

Nelson's Eighth Amendment rights. Therefore, qualified immunity is not appropriate in this case.

■ As the district court pointed out, however, there is a factual question of whether Overberg's state of mind actually amounted to deliberate indifference to a manifested threat to Nelson's right to be free from violence. There is sufficient evidence to allow the jury to draw the conclusion that Overberg knew of a threat to Nelson's safety and yet disregarded it, despite the availability of relatively effortless ways of addressing it, and that Overberg's conduct amounted to a conscious lack of concern or aloofness. *See Marsh v. Arn*, 937 F.2d 1056, 1069 (6th Cir. 1991). A jury may, of course, just as well not draw such a conclusion. But in light of the evidence and existing case law, it is beyond peradventure that, as a matter of law, Overberg's actions in this setting do not entitle him to qualified immunity.

## IV.

For the foregoing reasons, we **AFFIRM**.

ALAN E. NORRIS, Circuit Judge, dissenting.

Because I disagree that a reasonable prison official in Overberg's position should have known he was violating Nelson's clearly established rights, I would reverse the order of the district court denying summary judgment. Nelson's two vague letters sent mixed signals to Overberg. Nelson opened his first letter by noting that he was "pleased" with his placement, and acknowledged in his second letter that he had been "flowing smoothly and easily with the system" while awaiting placement. Although Nelson notified Overberg that he had received a threatening letter, he did not identify by name or prison number those threatening him; nor did he describe the circumstances surrounding the threat or append a copy of the threatening letter. We now know that Lisa Haynes had informed Nelson that her brother, a major cocaine dealer, and his friends were planning to attack him. We also know that the language of the threat Nelson received suggested it came from Lisa Haynes' brother, thereby confirming that Nelson had dangerous

enemies at OCI. Overberg, however, did not have the benefit of this information when he declined to act on Nelson's communications.

Approximately 18,000 inmates are placed each year in the Ohio prison system, and Overberg receives about seventy-five placement appeals per week. Under these circumstances, Nelson's two vague letters lacked the specificity to put a reasonable classification chief on notice that Nelson faced a genuine risk of physical violence. Overberg therefore was entitled to qualified immunity on Nelson's Eighth Amendment claim.

Moreover, even if the majority is correct that Overberg's conduct was sufficiently negligent that he was not entitled to qualified immunity, clearly, there was no evidence of the type of "deliberate indifference" that would permit Nelson to recover on the merits of his Eighth Amendment claim. Nelson has adduced no proof that Overberg acted in an "obdurate" or "wanton" manner, knowing that he was violating Nelson's rights. Accordingly, there was no genuine issue of material fact on the merits of Nelson's Eighth Amendment claim, and the district court should have granted summary judgment for Overberg.

For the foregoing reasons, I respectfully dissent.