**Michelle ORTIZ, Plaintiff,**

v.

**George VOINOVICH, et al., Defendants.**

No. C–2–98–1031.

United States District Court,
S.D. Ohio,
Eastern Division.

March 29, 2002.

918

Laurence Powers, Cleveland, OH, Mark Harron, John Ricotta, Cleveland, OH, for plaintiff.

Brian M. Zets, Schottenstein Zox & Dunn, Columbus, OH, Carol Anne Hamilton O'Brien, Philip A. King, Ohio Atty. Gen., Corrections Lit., Columbus, OH, for defendants.

## OPINION AND ORDER

MARBLEY, District Judge.

Plaintiff Michelle Ortiz brings this action under 42 U.S.C. § 1983 against defendants former Governor George Voinovich, Warden Shirley Rogers, Prison Investigator Rebecca Bright, and Cottage Manager Paula Jordan.[1] This matter is before the

---

1. Defendant Corrections Officer Douglas Schultz was dismissed from this lawsuit with-

out prejudice for failure to effect service pur-

Court on defendants' March 2, 2001 motion for summary judgment (doc. 52). For the reasons set forth below, defendants' motion for summary judgment is GRANTED IN PART and DENIED IN PART.

The complaint alleges that Ortiz was incarcerated at the Ohio Reformatory for Women at Marysville on November 8, 1996 when Corrections Officer Douglas Schultz went into her room, fondled her breasts, and made lewd comments. The complaint further alleges that Ortiz complained to defendant Jordan, but she took no steps to protect her. Then, the complaint alleges, on November 9, 1996, Schultz sexually assaulted Ortiz, and when she reported the assault, defendants subjected her to punishment by placing her in solitary confinement.

Schultz is not a party to this lawsuit. The main issue for decision is whether there is evidence from which a jury could conclude by a preponderance that defendant Jordan knew of Schultz's November 8 sexual assault and subjected plaintiff Ortiz to cruel and unusual punishment by failing to prevent Schultz's November 9 sexual assault.

**I. Motion to Strike**

Defendants move to strike plaintiff's memorandum in opposition to defendants' motion for summary judgment. Plaintiff was granted a 14–day extension to respond to the motion for summary judgment. The deadline for plaintiff to file her response was May 11, 2001. *See* March 27, 2001 Order (doc. 54). Plaintiff filed her response on May 18, 2001.

"Failure to comply with [S.D.Ohio Local Rule 7.2] may result in the imposition of

suant to Fed.R.Civ.P. 4(m). *See* Sept. 18, 2000 Order (doc. 40).

**2.** The dates contained in the complaint are incorrect by seven days. Feb. 26, 1999 Dep.

sanctions." S.D.Ohio L.Rule 7.2(c). The Court declines to impose sanctions on plaintiff for failure to submit her response brief before the May 11, 2001 deadline. Accordingly, defendants' May 22, 2001 motion to strike plaintiff's memorandum in opposition to defendants' motion for summary judgment (doc. 58) is **DENIED.**

It should be noted that plaintiff opposes the motion for summary judgment only as it pertains to defendant Paula Jordan. Although her failure to oppose the motion as it pertains to the other defendants does not warrant an automatic grant of summary judgment for those defendants, *see* L.Rule 7.2(a)(2), plaintiff has presented no arguments nor produced any evidence contrary to defendants' motion as it relates to defendants Voinovich, Rogers, and Bright.

**II. Allegations in the Complaint**

Ortiz alleges that on November 8, 1996,[2] Corrections Officer Douglas Schultz went into her room, fondled her breasts, and made lewd comments. Schultz threatened to "get her tomorrow." November 9, 1996 was scheduled to be, and in fact was, Schultz's last day of employment at the Marysville Reformatory for Women. Compl., ¶¶ 12–13.

Around 2:00 p.m. on November 9, 1996, Ortiz informed Corrections Officer Hall about Schultz's actions. Hall took Ortiz to see Cottage Manager Paula Jordan. Ortiz informed Jordan about the assault and the threat Schultz made. Compl., ¶¶ 15–16.

Ortiz alleges that later on November 9, 1996, Schultz made a sexually inappropriate comment to her. As she was asleep,

of Michelle Ortiz, 97:25–98:4. The parties agree that the initial sexual assault occurred on November 8, 1996.

Schultz sexually assaulted Ortiz. Compl., ¶¶ 17–18.

On November 10, Ortiz reported the assault to Corrections Officers Hall and Hollenbacker. Ortiz then saw Prison Investigator Bright and Warden Rogers, who instructed her to make out a written statement. On the next day, Ortiz appeared before Bright and Rogers and again explained what had happened. Bright commented that the charge was "a serious offense" and that Ortiz would be put in protective custody. Compl., ¶¶ 20–21.

Ortiz alleges that instead of being put in protective custody she was placed in solitary confinement on November 12, despite having committed no disciplinary infractions. Ortiz was shackled and handcuffed on her trip to "the hole" even though there was a standing order prohibiting ankle restraints on Ortiz. While in the hole, Ortiz was not provided with adequate heat, clothing, bedding, or blankets. The cell floor was covered with vomit. Ortiz's extremities became swollen. Compl., ¶¶ 23–25.

On November 13, Ortiz was taken to Bright's office, again in shackles. Bright allegedly stated, "O.k., you've been gone a couple of days. Whether or not you go back to your cottage depends on your story." Ortiz told Bright that her prior statements were true and accurate. After the meeting with Bright, Ortiz returned to segregation. Compl., ¶¶ 26–27. She was then taken to the infirmary. Compl., ¶ 30.

Ortiz's parents made telephone calls to prison administrators, including Rogers and Bright. These prison officials allegedly lied to Ortiz's parents by telling them that Ortiz was fine and in protective custody. Ortiz's parents called Governor Voinovich's office and informed his assistant, Matt Peterson, about their daughter. Petterson assured them that he would relay the information to Governor Voinovich. Compl., ¶¶ 28–29.

On November 20, Ortiz was taken to Bright's office, where she took, at her request, a polygraph test. The person administering the test concluded that Ortiz was telling the truth about the assaults. On the same day, Ortiz was returned to her room in the cottage. Compl., ¶ 31.

The complaint makes the following Eighth Amendment claims: failure to protect against defendant Jordan; violation of due process and denial of medical treatment against defendants Bright and Rogers; and denial of medical treatment against defendant Voinovich.

### III. Summary Judgment

Summary judgment is governed by Rule 56(c) of the Federal Rules of Civil Procedure which provides:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

"[T]his standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (emphasis in original); *Kendall v. The Hoover Co.,* 751 F.2d 171, 174 (6th Cir.1984).

Summary judgment will not lie if the dispute about a material fact is genuine; "that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477

U.S. at 247–248, 106 S.Ct. 2505. The purpose of the procedure is not to resolve factual issues, but to determine if there are genuine issues of fact to be tried. *Lashlee v. Sumner,* 570 F.2d 107, 111 (6th Cir. 1978). Therefore, summary judgment will be granted "only where the moving party is entitled to judgment as a matter of law, where it is quite clear what the truth is, . . . [and where] no genuine issue remains for trial, . . . [for] the purpose of the rule is not to cut litigants off from their right of trial by jury if they really have issues to try." *Poller v. Columbia Broadcasting System, Inc.,* 368 U.S. 464, 467, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962); *accord, County of Oakland v. City of Berkley,* 742 F.2d 289, 297 (6th Cir.1984).

In a motion for summary judgment the moving party bears the "burden of showing the absence of a genuine issue as to any material fact, and for these purposes, the [evidence submitted] must be viewed in the light most favorable to the opposing party." *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970) (footnote omitted). Inferences to be drawn from the underlying facts contained in such materials must be considered in the light most favorable to the party opposing the motion. *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); *Watkins v. Northwestern Ohio Tractor Pullers Association, Inc.,* 630 F.2d 1155, 1158 (6th Cir. 1980).

If the moving party meets its burden and adequate time for discovery has been provided, summary judgment is appropriate if the opposing party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548. The mere existence of a scintilla of evidence in support of the opposing party's position will be insufficient; there must be evidence on which the jury could reasonably find for the opposing party. *Anderson,* 477 U.S. at 251, 106 S.Ct. 2505 (quoting *Improvement Co. v. Munson,* 14 Wall. 442, 448, 20 L.Ed. 867 (1871)). As is provided in Fed. R.Civ.P. 56(e):

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him.

Thus, "a party cannot rest on the allegations contained in his . . . [pleadings] in opposition to a properly supported motion for summary judgment against him." *First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 259, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968) (footnote omitted).

## IV. Discussion

### A. Defendant Jordan

The day after Schultz first sexually assaulted Ortiz and threatened to "get her tomorrow," Ortiz made the situation known to Jordan. Ortiz argues that Jordan should be held liable for failing to take the actions necessary to prevent Schultz from assaulting Ortiz later that day.

 Prisoners have a constitutional right to be protected from the violence of other prisoners and prison officials. *Farmer v. Brennan,* 511 U.S. 825, 833–34, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994); *Wilson v. Yaklich,* 148 F.3d 596, 601 (6th Cir.1998). However, prison officials overstep constitutional bounds only when they "fail to take reasonable measures to pro-

tect inmates against substantial risks of serious harm of which they have knowledge." *Wells v. Jefferson County Sheriff Dep't,* 159 F.Supp.2d 1002, 1010 (S.D.Ohio 2001) (citing *Farmer,* 511 U.S. at 837–38, 114 S.Ct. 1970; *Street v. Corrections Corporation of America,* 102 F.3d 810, 814–15 (6th Cir.1996)). Although an inmate need not show that "he has been the victim of an actual attack to bring a personal safety claim, he must establish that he reasonably feared such an attack." *Thompson v. County of Medina,* 29 F.3d 238, 242 (6th Cir.1994) (citing *Marsh v. Arn,* 937 F.2d 1056, 1062 n. 5 (6th Cir.1991)). An inmate must show that a prison official acted with deliberate indifference in failing to protect the inmate against the risk of assault. *McGhee v. Foltz,* 852 F.2d 876, 880–81 (6th Cir.1988); *see also Wilson,* 148 F.3d at 601; *Wells,* 159 F.Supp.2d at 1010.

 Defendants have submitted an affidavit from Jordan. Defs.' Mot. for Summ. J.Ex. D, Feb. 2001 Aff. of Paula Jordan. Corrections Officer Hall brought Ortiz to her office on November 9, 1996 at approximately 2:15 p.m. Jordan Aff., ¶ 3. Hall then left Jordan's office. *Id.* Ortiz told Jordan about a corrections officer rubbing her shoulders and touching her breast. *Id.,* ¶ 4. According to Jordan, Ortiz would not tell her the identity of the corrections officer, other than to indicate that the person was a male. *Id.* Ortiz did not tell Jordan that the officer had threatened to "get her." *Id.*

Jordan believed that Ortiz was "calm and in control of the situation [and] did not appear to be afraid." *Id.,* ¶ 5. "She did not appear worried that the officer would try to touch her again." *Id.* Ortiz and Jordan discussed Ortiz staying around other people to be safer, and Jordan suggested that Ortiz "stay in the rec room, which is a more open area with more people around." *Id.* Ortiz told Jordan "that she

did not want anything done about it and she did not want to get the officer into trouble. . . . [S]he was adamant about not reporting the officer." *Id.*

Jordan then wrote an incident report, but did not turn the report in until November 12. Jordan reported that Ortiz told her about a corrections officer rubbing her shoulders and touching her breast. "The [inmate] would not tell me any other information about this incident." Defs.' Mot. for Summ.J.Ex. L.

In the written statement Ortiz prepared at Bright and Rogers's request on November 10, 1996, Ortiz described her meeting with Jordan as follows:

> So we [Ortiz and Hall] together went to talk to her [Jordan]. She informed me that we could report this because no one has the right to touch you—unless you've done something—and I explained to her that since the man was leaving tonight—we'll just let it go—to save putting on the man's record at his age. She said she believes he is somewhat of the old school in as far as more physical—but not that way. She understood what I was saying [and] said she would be back on Tuesday—[and] if anything happened tonight do what you have to do to defend yourself [and] then you'll have to report it—because that's just not right.

Defs.' Mot. for Summ.J.Ex. I, p. 2.

In a letter written by Ortiz and sent to her mother, Darlene DeMarchi, Ortiz stated:

> Anyway, [Hall] said he was between a rock and a hard place [and] I needed to tell Miss Jord[a]n—case Manager—so we went to her office and he told her who it involved [and] who it was. She said why don't you tell me about it, first of all was it the man who just walked in as he went past her window—and said yes. OK—go on—so I went onto tell

her everything [and] she was mad—she wanted me to report it—but I told her if I can get through today· (Saturday) I just rather do that. She said to use the buddy system and do anything you have to· do to protect yourself if anything happens....

Defs.' Mot. for Summ.J.Ex. K, p. 4 (typewritten version).[3]

Ortiz again described her meeting with Jordan in deposition testimony:

[Jordan.] took my story and she asked me at the time, what did I want to do, what did I want her to do about it. And I—that's when I told her—... I didn't wish to give the man a record. He jokes around with people a lot, so if he was just joking around, fine, but I didn't feel comfortable with him threatening me to see me again tonight.

I wanted her to be aware of what had happened, in case I have any trouble with him again. She said that was wise for me to come and talk to her and that I told her I didn't wish to give the man a record. Tonight, being his last night, if he would just leave me alone for tonight, then he would be gone tomorrow. She agreed with me. She said that—did I just want to stay around my friends for the evening and—she knows I don't like to go out, and she said she knew I didn't like to hang out in the .day room, but if I did that just tonight he would be gone tomorrow. And I said, yes, I would do that.

Feb. 26, 1999 Dep. of Michelle Ortiz, 95:9– 96:11.

Based on this evidence, the Court concludes that Ortiz has created a genuine issue of fact as to whether she reasonably feared a further sexual attack from

Schultz. After the first attack, Schultz threatened to "get her" the next day before he left his employment at the Marysville Reformatory for Women. Although Jordan's affidavit states that Ortiz was "calm" and "did not appear to be afraid," a jury could find that Ortiz reasonably feared another attack. Ortiz testified that she "didn't feel comfortable" and that she saw Jordan based on the concern that she would have "trouble with him again." Ortiz called her parents and expressed concern to them. Defs.' Mot. for Summ.J.Ex. F,. Transcript of Nov. 9, 1996 Telephone Call.

█ The Court further concludes that Ortiz has created a genuine issue of fact as to whether Ortiz made Jordan aware that she reasonably feared a further sexual attack. Although Jordan denies that Ortiz told her the identity of the officer or told her that the officer had threatened her, a jury could reasonably find from the written statement, the letter, and Ortiz's testimony that Ortiz did inform Jordan of Schultz's identity and the threat he made. Further, although perhaps not admissible for the truth of the matter stated, polygraph examiner J.D. Caudhill concluded that Ortiz truthfully stated that she identified Schultz to Jordan as the officer who assaulted her. *See* Pl.'s April 27, 2000 Status Report (doc. 35), Ex. 1.

Finally, the Court concludes that Ortiz has created a genuine issue of fact as to whether Jordan acted reasonably once Ortiz made Jordan ˙aware of her fear of assault. Prison officials must "take reasonable measures to protect inmates against substantial risks of serious harm of which they have knowledge." *Wells v. Jefferson County Sheriff Dep't,* 159 F.Supp.2d 1002, 1010 (S.D.Ohio 2001). The evidence estab-

---

**3.** The letter is not dated. Based on statements made near the end of the letter, it appears Ortiz wrote the letter while she was still in˙ segregation and just before she took the polygraph test.

lishes the following: Jordan told Ortiz that no one had the right to touch her; Jordan recommended that Ortiz file a report, but Ortiz refused and told Jordan to "just let it go"; Jordan instructed Ortiz to stay around her friends; Jordan recommended that Ortiz spend the evening and night in the day or rec room, where she would be in the open and around other persons; Jordan told Ortiz to "do anything you have to do to protect yourself if anything happens"; Ortiz represented to Jordan that she would use the "buddy system" to safeguard herself that night; and Jordan filled out an incident report, but did not turn it in until two or three days later. .

A jury could reasonably find that Jordan should have taken more precautions to safeguard Ortiz from a second assault. Although a prison official's duty is to ensure reasonable safety and not to provide absolute protection from harm, *Farmer*, 511 U.S. at 844, 114 S.Ct. 1970, Jordan could have taken measures to ensure that Schultz would be separated from Ortiz for the rest of the day. For instance, Jordan could have reassigned Schultz to another area in the prison or ordered Schultz to take the evening off work. Jordan could have assigned another officer to keep a close watch on Ortiz and Schultz. These actions likely would not have been burdensome on prison administration because November 9 was Schultz's last day and the actions would have been only temporary.

It is unclear from the record whether case manager Jordan had the authority to order these actions, but—in the absence of defendants proving Jordan did not—defendants are not entitled to summary judgment. Even if Jordan lacked such authority, a jury could reasonably find that she should have reported the sexual assault to a prison official who had the authority to separate Ortiz and Schultz. Defendants rely heavily on Ortiz's insistence that Jor-

dan not report the assault. Ortiz's wishes should be considered, but they are not conclusive on the issue of whether Jordan responded reasonably. A jury could find that the threat of harm to Ortiz was sufficiently serious that Jordan, as case manager, had an obligation to ensure Ortiz's safety even if it meant overriding Ortiz's wishes. Indeed, Jordan saw fit to prepare an incident report but failed to turn it in that day. A jury could view Jordan's failure to turn the report in on a timely basis as evidence that Jordan did not respond reasonably to the threat of harm against Ortiz.

 Defendants claim that Jordan is nonetheless entitled to qualified immunity. Government officials performing discretionary functions are afforded a qualified immunity under 42 U.S.C. §. 1983 as long as their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 817–18, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *Christophel v. Kukulinsky*, 61 F.3d 479, 484 (6th Cir.1995). The question is not the subjective good or bad faith of the public official, but the "objective legal reasonableness" of her action in light of clearly established law at the time the official acted. *Anderson v. Creighton*, 483 U.S. 635, 638–39, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). In order for the violated right to be clearly established, the contours of the right must be sufficiently clear that a reasonable official would understand that what she is doing violates that right; in light of pre-existing law, the unlawfulness of the officials action must be apparent. *Anderson*, 483 U.S. at 640, 107 S.Ct. 3034.

 The burden is on a defendant to plead qualified immunity. *Wegener v. Covington*, 933 F.2d 390, 392 (6th Cir. 1991). The ultimate burden of proof is on

the plaintiff to show that the defendants are not entitled to qualified immunity. *Id.* When a defendant moves for summary judgment based on qualified immunity, the plaintiff must (1) identify a clearly established right alleged to have been violated; and (2) establish that a reasonable officer in the defendant's position should have known that the conduct at issue was undertaken in violation of that right. *Pray v. City of Sandusky,* 49 F.3d 1154, 1158 (6th Cir.1995).

 Plaintiff's right to be protected from violence at prison was clearly established at the time Ortiz informed Jordan of the sexual assault. *Farmer v. Brennan,* 511 U.S. 825, 833–34, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). Further, if one credits Ortiz's testimony and evidence, a reasonable official in Jordan's position should have known that the conduct at issue was undertaken in violation of that right. Jordan did little to ensure Ortiz would be protected from Schultz. Jordan failed to turn in the incident report or otherwise notify prison officials of the situation. Although Jordan told Ortiz to use the buddy system and Ortiz represented that she would, the prison presumably had a curfew; thus, Jordan knew at some point in the evening Ortiz would be alone[4] and Schultz would have access to her. Jordan did nothing to prevent this occurrence. This amounts to deliberate indifference.

Defendants compare this case to *Marsh v. Arn,* 937 F.2d 1056 (6th Cir.1991). In *Marsh,* an inmate sued prison officials after she was severely beaten by another inmate. On December 18, 1985, inmate Marsh informed lieutenant Furrow that roommate Leonard threatened to sexually assault her. Furrow responded by placing Marsh in the infirmary for the night. On the next day, Leonard renewed her threats and Furrow talked to the two women in her office. Furrow sent both inmates back to their dorm. Furrow then filled out a staff report to the prison's Deputy Superintendent requesting that Leonard be moved to a single room. The court found that Furrow had not acted indifferently to the threat of harm and thus was entitled to qualified immunity. 937 F.2d at 1058.

*Marsh* is distinguishable. Unlike Furrow, Jordan did not separate Ortiz and Schultz on the day Jordan became aware of the threat of harm. Jordan did not meet with Ortiz and Schultz to assess the likelihood Schultz would carry out his threat. Furthermore, Jordan did not timely file a report alerting supervisors to the problem and requesting that Ortiz and Schultz be separated.

Accordingly, defendant Jordan is not entitled to summary judgment.

## B. Defendants Bright and Rogers

### 1. Due Process

On the day after the second assault, Ortiz met with Bright and Rogers. They instructed her to make out a written statement. On the next day, Ortiz again appeared before Bright and Rogers to explain her version of what happened. Bright commented that the charge was "a serious offense" and that Ortiz would be put in protective custody.

The complaint alleges that rather than being put in protective custody, Ortiz was placed in solitary confinement, or the "hole," as a disciplinary measure for her accusing Schultz of wrongdoing. The complaint alleges that Bright and Rogers violated Ortiz's right to due process because

---

4. Defendants have not established that Ortiz had a roommate who would have deterred Schultz from attempting an assault.

Ortiz's placement in solitary confinement was retaliatory in nature and not pursuant to legitimate penological interests. Ortiz contends that she did not commit a disciplinary violation and that she was placed in segregation without first being afforded a hearing.

In determining whether segregation of an inmate from the general prison population deprives her of a state-created liberty interest protected by the Due Process Clause, "courts are to determine if the segregation imposes an 'atypical and significant' hardship on the inmate 'in relation to the ordinary incidents of prison life.'" *Jones v. Baker*, 155 F.3d 810, 812 (6th Cir.1998) (quoting *Sandin v. Conner*, 515 U.S. 472, 483, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995)). Administrative segregations generally do not impose an "atypical and significant" hardship on inmates. *Id.* (citing *Rimmer–Bey v. Brown*, 62 F.3d 789, 790–91 (6th Cir.1995); *Mackey v. Dyke*, 111 F.3d 460, 463 (6th Cir. 1997)).

On November 12, 1996, Bright assigned Ortiz to "Security Control for Investigation" status. Bright Hoffman Aff., ¶¶ 11–12. Under Ohio Administrative Code § 5120–9–11, inmates may be placed in security control because of a rule infraction or a threat to prison order or inmate security. O.A.C. § 5120–9–11(A). Ortiz was put in "ARN 4," the housing unit in which inmates on security control, administrative control, local control, and protective control status are placed. Bright Hoffman Aff., ¶ 14.

The purported reason Bright placed Ortiz in security control is that she disobeyed a gag order not to talk about the incident to persons other than Bright. Ortiz "continually discuss[ed] the incident" to others. *Id.*, ¶ 11. Bright "was worried about the integrity of the investigation" and wanted to be able to investigate the allegation and evaluate Ortiz's credibility "without interference." *Id.*, ¶ 13.

The Court concludes that the segregation of Ortiz imposed an atypical and significant hardship on her. A jury could reasonably find that Bright and Rogers's purported reason for placing Ortiz in security control was pretextual. Defendants have not conclusively justified the imposition of the gag order. According to Bright, the formal investigation against Schultz ended once he left his position of employment at the prison. Bright no longer had authority over Schultz. To the extent Bright continued to investigate the truth of Ortiz's claim once Schultz left, it is unclear why a gag order was necessary. A jury could find that Bright imposed the gag order in an attempt to make Ortiz stop claiming that she was assaulted.

Even if the gag order was legitimately imposed, a jury could find that Ortiz did not violate it. Ortiz claims that she committed no disciplinary infractions. At least before the second assault, Ortiz was reticent to speak about Schultz's conduct. There is no evidence, other than Bright's assertion, that Ortiz "continually" talked or interfered in any way with the investigation. Ortiz did discuss the assaults with Officers Hall and Hollenbacker, Jordan, Bright, and Rogers, as well as her parents, but defendants have not demonstrated why these discussions would have compromised the integrity of the investigation.

Upon finding that the gag order was not legitimately imposed and/or finding that Ortiz did not violate the order, a jury could reasonably conclude that Ortiz was put in segregation because she claimed Schultz assaulted her. Placement in segregation based on such a retaliatory motive, as opposed to legitimate penological interests, is an atypical and significant

hardship. It is not an ordinary incident of prison life for a person claiming to be the victim of sexual assault by a prison guard to be thrown into "the hole" for no reason other than the fact she reported the assaults to prison officials. Due process demands some legitimate justification for putting Ortiz in security control. Prison regulations which limit the conditions under which inmate can be placed into segregation create a protected liberty interest. *Howard v. Grinage*, 6 F.3d 410, 412 (6th Cir.1993); *Beard v. Livesay*, 798 F.2d 874, 878 (6th Cir.1986). Under Ohio Administrative Code § 5120-9-11(A), placement in security control must be "because of an alleged rule infraction." [5] If indeed defendants placed Ortiz in security control even though the conditions of O.A.C. § 5120-9-11 were not satisfied, then she was denied due process. *See Howard*, 6 F.3d at 413-14 (violation of due process where inmate's transfer to higher security custody was not for medical reasons permitted by prison regulations).

Accordingly, defendants Bright and Rogers are not entitled to summary judgment against Ortiz's due process claim.

### 2. Denial of Medical Treatment

The complaint alleges that Ortiz was not provided adequate heat, clothing, bedding, or blankets while she was in ARN 4. According to Ortiz, she had jeans, a t-shirt, a sweatshirt, half a blanket, and one sheet of bedding. Ortiz Dep., 121:21-122:10. Ortiz vomited on the floor one time, and it was not cleaned up. *Id.*, 122:25-123:3. Ortiz had a fever and was given two Tylenol tablets. *Id.*, 123:4-16. The complaint alleges that Ortiz's extremities became swollen. Ankle shackles were used on Ortiz to transport her to and from ARN-4, despite a medical order not to use ankle restraints.

The complaint further alleges that Rogers and Bright lied to Ortiz's parents in telephone conversations about their daughter's well-being.

■■■■■ To obtain redress for medical mistreatment under the Eighth Amendment, a prisoner must show a prison official's "deliberate indifference to serious medical needs" of the prisoner. *Estelle v. Gamble*, 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); *Williams v. Mehra*, 186 F.3d 685, 691 (6th Cir.1999); *Brooks v. Celeste*, 39 F.3d 125, 127 (6th Cir.1994). Specifically, two requirements must be met. First, the alleged deprivation "must be, objectively, 'sufficiently serious,'" resulting "in the denial of 'the minimal civilized measure of life's necessities.'" *Farmer v. Brennan*, 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (quoting *Wilson v. Seiter*, 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991); *Rhodes v. Chapman*, 452 U.S. 337, 347, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981)). Where a claim is based on a failure to prevent harm, "the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm." *Id.*

■■■■■ The second requirement is that the prison official have a "sufficiently culpable state of mind." *Farmer*, 511 U.S. at 834, 114 S.Ct. 1970 (quoting *Wilson*, 501 U.S. at 302-303, 111 S.Ct. 2321). To be sufficiently culpable, an official must act with "deliberate indifference" to inmate health or safety. *Id.*; *Wilson*, 501 U.S. at 303, 111 S.Ct. 2321. That is, the official must know of and disregard an excessive risk to inmate health or safety. *Farmer*, 511 U.S. at 837, 114 S.Ct. 1970. Mere negligence is not sufficient. *Id.* at 838-39, 114 S.Ct. 1970.

---

**5.** There are other grounds for placement in security control, but they are not relevant here.

■■■■■ There is no evidence of direct personal involvement by Bright or Rogers in the conditions allegedly suffered by Ortiz. Section 1983 liability may not be imposed where there is no involvement on the part of an official. *Searcy v. City of Dayton*, 38 F.3d 282, 287 (6th Cir.1994); *Bellamy v. Bradley*, 729 F.2d 416, 421 (6th Cir.1984). Ortiz testified that the mistreatment came from prison guards working in ARN 4. Ortiz Dep., 120:4–124:14.

■■■■■ Section 1983 liability must be based on more than the right to control employees. *Hays v. Jefferson County*, 668 F.2d 869, 874 (6th Cir.1982); *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir.1999).

> [A] supervisory official's failure to supervise, control or train the offending individual is not actionable unless the supervisor "either encouraged the specific incident of misconduct or in some other way directly participated in it. At a minimum a plaintiff must show that the official at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers."

*Shehee*, 199 F.3d at 300 (quoting *Hays*, 668 F.2d at 874); *see also Bellamy v. Bradley*, 729 F.2d 416, 421 (6th Cir.1984).

There is no evidence that Bright and Rogers had knowledge of the alleged conditions and mistreatment. While Ortiz was in security control, Bright and Rogers were not aware of any problems with heat, bedding, sanitation, or access to medical treatment in ARN 4. Bright Hoffman Aff., ¶ 12; Rogers Aff., ¶¶ 12–13. Bright and Rogers received no notice, kite, or complaint that Ortiz lacked such items. Bright Hoffman Aff., ¶ 12; Rogers Aff., ¶¶ 12–14. Bright and Rogers did not order that Ortiz be put in shackles, and they were unaware of a medical order that ankle shackles should not be used on Ortiz.[6] Bright Hoffman Aff., ¶ 21; Rogers Aff., ¶¶ 15.

When Bright did become aware that Ortiz needed medical attention, Bright responded appropriately. ARN 4 personnel informed Bright that Ortiz claimed she was sick. Bright Hoffman Aff., ¶ 19. Bright promptly had Ortiz transferred to the infirmary. *Id.*

Darlene DeMarchi testified that she spoke once with Rogers. Rogers telephoned DeMarchi at work and informed her that her daughter would be put in protective custody and "be able to have her stuff." Jan. 18, 2001 Dep. of Darlene DeMarchi, 54:3–55:8; 88:8–89:16. DeMarchi also spoke with Bright on one occasion. *Id.*, 60:23–61:8. Bright called DeMarchi and told her that she would not be able to see her daughter because she was in protective custody. *Id.*, 86:14–87:18. Although Bright and Rogers may have been slightly incorrect in telling DeMarchi that Ortiz was in protective custody—as opposed to security control—Bright and Rogers did not make any statements to DeMarchi which contributed to Ortiz failing to receive medical care.

Accordingly, Bright and Rogers did not deny Ortiz proper medical care while she was in security control.

### C. Defendant Voinovich

■■■■ DeMarchi called the governor's office and spoke to one of his aides about Ortiz. DeMarchi Dep., 52:20:53:1. DeMarchi did not recall his name. *Id.* DeMarchi did not testify as to the content of her conversation with the governor's aide.

---

**6.** Indeed, the medical order that Ortiz not be shackled around the ankles was not issued until April 2, 1997. Ortiz Dep., Ex. F.

Plaintiff has submitted no evidence of personal involvement by Governor Voinovich in the denial of medical treatment to Ortiz. *See Searcy v. City of Dayton,* 38 F.3d 282, 287 (6th Cir.1994); *Bellamy v. Bradley,* 729 F.2d 416, 421 (6th Cir.1984). Further, Voinovich cannot be held liable under a theory of *respondeat superior* for the actions of the ARN 4 personnel. *See Hays v. Jefferson County,* 668 F.2d 869, 874 (6th Cir.1982); *Shehee v. Luttrell,* 199 F.3d 295, 300 (6th Cir.1999).

To the extent the complaint alleges that Voinovich had a duty to launch an investigation of Ortiz's situation, the Court disagrees. There is no evidence Voinovich had knowledge of Ortiz's situation. There is no credible allegation that the aide informed Voinovich of his phone call with DeMarchi.

## V. Conclusion

For the reasons set forth above, defendants' March 2, 2001 motion for summary judgment (doc. 52) is GRANTED IN PART and DENIED IN PART.